Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES<br><br>          Plaintiffs,<br><br>vs.<br><br>FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATE FISH & WILDLIFE SERVICE, an agency of the U.S. Department of the Interior,<br><br>          Defendants. | CV-13-64-M-DWM<br><br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

# I. INTRODUCTION

1.      This is a civil action for judicial review under the citizen suit provision of the

Endangered Species Act and the Administrative Procedure Act of the U.S.

Forest Service's (Forest Service) and U.S. Fish and Wildlife Service's (FWS)

authorizations of the Lonesome Wood II Project (Project) on the Gallatin

National Forest (Forest), the Gallatin National Forest Land and Resource

Management Plan (Forest Plan), and the Northern Rockies Lynx Management

Direction (Lynx Direction).

2.      Plaintiffs Alliance for the Wild Rockies and Native Ecosystems Council attest

that the decisions approving the Project and Forest Plan and Lynx Direction

are arbitrary and capricious, an abuse of discretion, and/or otherwise not in

accordance with law.

3.      Defendants' approval of the Project and Forest Plan and Lynx Direction and

corresponding documents as written is a violation of the National

Environmental Policy Act (NEPA), 42 U.S.C. 4331 *et seq.*, the National

Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, the Endangered

Species Act (ESA), 16 U.S.C. § 1531 *et seq*,  and the Administrative

Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*

4.      Plaintiffs request that the Court set aside or remand the Project decision,

Forest Plan, and Lynx Direction pursuant to 5 U.S.C. § 706(2)(A) and 16 U.S.C. § 1540(g), and that the Court enjoin implementation of the Project.

5. Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the Endangered Species Act, 16 U.S.C. § 1540(g)(4), and such other relief as this Court deems just and proper.

## II. JURISDICTION

6. This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

7. An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Gallatin National Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

8. The aesthetic, recreational, scientific, spiritual, and educational interests of

Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, ESA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

9.    Plaintiffs sent a notice of intent to sue under the ESA on January 8, 2013. Thus, Plaintiffs have complied with the 60 day notice requirement for claims under the ESA and this Court has jurisdiction to review Plaintiffs' ESA claims.

10.   Plaintiffs submitted timely written comments concerning the Project and fully participated in the available administrative review and appeal processes, thus they have exhausted administrative remedies. Defendants' denials of Plaintiffs' administrative appeals were the final administrative actions of the U.S. Department of Agriculture Forest Service. Thus, the Court has jurisdiction to review Plaintiffs' APA claims.

## III. VENUE

11.   Venue in this case is proper under 28 U.S.C. § 1391(e) and LR 3.3(a)(1). Defendant Krueger, the chief representative for U.S. Forest Service Region

One, and the chief representative of the U.S. Forest Service in Montana, resides within the Missoula Division of the United States District Court for the District of Montana.

## IV. PARTIES

12.   Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems.  Its registered office is located in Helena, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana.  Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Gallatin National Forest.  Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project, Forest Plan, and Lynx Direction.  Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

13.   Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana

corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Gallatin National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Gallatin National Forest, including the Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

14. Defendant FAYE KRUEGER is the Regional Forester for the Northern Region/Region One of the U.S. Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at each National Forest in the Northern Region, including the Gallatin National Forest, are consistent with applicable laws, regulations, and official policies and procedures.

15. Defendant UNITED STATES FOREST SERVICE (Forest Service) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the

Gallatin National Forest.

16. Defendant UNITED STATE FISH AND WILDLIFE SERVICE is an administrative agency within the U.S. Department of Interior and is responsible for lawful management of species listed under the Endangered Species Act.

## V. PROCEDURAL BACKGROUND

17. The Forest Service published the draft EIS for the Project in September of 2011.

18. Plaintiffs filed timely public comments on that draft EIS.

19. The Forest Service signed the Record of Decision authorizing the Project on December 11, 2012.

20. On January 8, 2013, Plaintiffs sent a 60 day notice of intent to sue under the ESA.

21. Plaintiffs filed timely administrative appeals of the Project.

22. On March 18, 2013, the Forest Service denied Plaintiffs' administrative appeals of the Project.

23. As of the date of the filing of the Complaint, the Forest Service had not yet awarded any commercial timber sales for the Project.

# VI. FACTUAL ALLEGATIONS

PROJECT AREA

24.    The Project area is 23,600 acres, and is located in Gallatin County, Montana approximately 12 miles west and north of West Yellowstone, Montana, along the Hebgen Lake Road and the west shore of Hebgen Lake.

25.    The "Project area" refers to all proposed treatment units, Project roads, and the area within a one-mile buffer of these features. The Project area is considered the action area for this proposed action.

26.    The analysis area (Timber Compartments 709 and 710) is approximately 74 percent forested, primarily with subalpine fir habitat types (95%). The general forested areas are composed of cool to moist Douglas-fir habitat types (about 5 percent) on the lower elevations facing south and west, with cool subalpine fir habitat types dominated by lodgepole pine at many elevations and aspects (about 61%) and cold to moist subalpine fir dominated overstories (usually at higher elevations) on around 28% of the forest ground. On about 7% of the higher forested ground, cold and moist upper subalpine fir and timberline habitat types dominant.

27.    The most common habitat types include: subalpine fir/huckleberry, subalpine fir/pinegrass, subalpine fir/sitka alder, subalpine fir grouse whortleberry and

subalpine fir-whitebark pine/grouse whortleberry.

28. In contrast to assumptions in the original analysis for the Lonesome Wood I project, mountain pine beetles and Douglas-fir bark beetles do not currently present a significant threat of tree mortality in the Project area. A recent survey in the Project area analyzing probable mountain pine beetle mortality levels indicates a low chance of continued mortality where just a few years ago the Forest Service believed an epidemic seemed likely. In 2010 and 2011, very few recent mountain pine beetle killed trees were evident, and Douglas fir beetle numbers have been dropping and are currently at light levels.

29. The Hebgen Lake area has in the past been extensively roaded primarily for forest management and removal of forest products.

30. The Forest Service has allowed 2,555 acres of past logging in/around the Project area since 1945.

31. Past logging was primarily clear-cutting that focused mainly on removing old forests.

32. There is ongoing logging and associated temporary road construction and use in/around the Project area (90 acres) as part of the Hebgen Basin Fuels Reduction Project.

33. There may be another logging and road construction project in the area – the Rendezvous Trails Thinning Project – but the details were not disclosed in the EIS.

34. There are 118 miles of roads that have been built in/around the Project area and 20 miles that have been decommissioned.

PROJECT & IMPACTS/ANALYSIS

35. The Project allows 1,750 acres of commercial logging to remove larger trees. There is no diameter limit for that logging, and the logging includes logging 495 acres of old growth forest.

36. The Project also allows an additional 825 acres of potentially commercial logging to remove smaller trees (six inches or less in diameter), and 325 acres of slashing and/or prescribed burning.

37. The Project allows construction of six miles of new temporary logging roads and the reopening/reconstruction of 2.8 miles of temporary logging roads.

38. Full implementation of the Project is expected to take 8-12 years.

39. The Project will cause a "reduction in secure habitat" for grizzly bears by affecting "about 69 acres of existing secure habitat."

40. The Project will eliminate 2,266 acres of potential lynx habitat, including the elimination of 1,548 acres of multi-storied snowshoe hare (prey) habitat.

41. The Project allows logging of 986 acres of goshawk habitat, which is 18% of the Trapper Creek home range, and includes 776 acres of mature forest.

42. The Project will eliminate 1,293 acres of pine marten habitat.

43. The Project will remove 277 acres of moose winter range (16% of existing winter range).

44. The Project will remove 495 acres of old growth forest.

45. The Project proposes logging on 370 acres within an inventoried roadless area. Units 2, 13, 14, and 15 are within the Lionhead 1-963 Inventoried Roadless Area.

46. The commercial aspects of the Project will not fully fund the Project. Implementation of the Project will result in a net loss to the federal government, and therefore the federal taxpayers, of $468,564.00.

FIRE ECOLOGY

47. Schoennagel et al (2004) states: "we are concerned that the model of historical fire effects and 20th-century fire suppression in dry ponderosa pine forests is being applied uncritically across all Rocky Mountain forests, including where it is inappropriate []."

48. Schoennagel et al (2004) states: "High-elevation subalpine forests in the Rocky Mountains typify ecosystems that experience infrequent, high-severity

crown fires []. . . The most extensive subalpine forest types are composed of Engelmann spruce (Picea engelmannii), subalpine fir (Abies lasiocarpa), and lodgepole pine (Pinus contorta), all thin-barked trees easily killed by fire. Extensive stand-replacing fires occurred historically at long intervals (i.e., one to many centuries) in subalpine forests [], typically in association with infrequent high-pressure blocking systems that promote extremely dry regional climate patterns []."

49. Schoennagel et al (2004) statea: "it is unlikely that the short period of fire exclusion has significantly altered the long fire intervals in subalpine forests []. Furthermore, large, intense fires burning under dry conditions are very difficult, if not impossible, to suppress [], and such fires account for the majority of area burned in subalpine forests [].

50. Schoennagel et al (2004) states: "Moreover, there is no consistent relationship between time elapsed since the last fire and fuel abundance in subalpine forests [], further undermining the idea that years of fire suppression have caused unnatural fuel buildup in this forest zone."

51. Schoennagel et al (2004) states: "No evidence suggests that spruce–fir or lodgepole pine forests have experienced substantial shifts in stand structure over recent decades as a result of fire suppression. Overall, variation in

climate rather than in fuels appears to exert the largest influence on the size, timing, and severity of fires in subalpine forests []. .We conclude that large, infrequent standreplacing fires are "business as usual" in this forest type, not an artifact of fire suppression."

52.    Schoennagel et al (2004) states: "Contrary to popular opinion, previous fire suppression, which was consistently effective from about 1950 through 1972, had only a minimal effect on the large fire event in 1988 []. Reconstruction of historical fires indicates that similar large, high-severity fires also occurred in the early 1700s []. Given the historical range of variability of fire regimes in high-elevation subalpine forests, fire behavior in Yellowstone during 1988, although severe, was neither unusual nor surprising."

53.    Schoennagel et al (2004)(emphasis added) states: "Mechanical fuel reduction in subalpine forests would not represent a restoration treatment but rather *a departure from the natural range of variability* in stand structure."

54.    Schoennagel et al (2004) states:  "Given the behavior of fire in Yellowstone in 1988, fuel reduction projects probably will not substantially reduce the frequency, size, or severity of wildfires under extreme weather conditions."

55.    Schoennagel et al (2004)(emphases added) states:  "The Yellowstone fires in 1988 revealed that variation in fuel conditions, as measured by stand age and

density, had only minimal influence on fire behavior. Therefore, *we expect*
*fuel-reduction treatments in high-elevation forests to be generally*
*unsuccessful in reducing fire frequency, severity, and size*, given the
overriding importance of extreme climate in controlling fire regimes in this
zone. Thinning also will not restore subalpine forests, because they were
dense historically and have not changed significantly in response to fire
suppression. Thus, *fuel-reduction efforts in most Rocky Mountain subalpine*
*forests probably would not effectively mitigate the fire hazard, and these*
*efforts may create new ecological problems by moving the forest structure*
*outside the historic range of variability"*

56.     Likewise, Brown et al (2004) states:

> At higher elevations, forests of subalpine fir, Engelmann
> spruce[], mountain hemlock [], and lodgepole or whitebark pine
> [] predominate. These forests also have long fire return intervals
> and contain a high proportion of fire sensitive trees []. At periods
> averaging a few hundred years, extreme drought conditions
> would prime these forests for large, severe fires that would tend
> to set the forest back to an early successional stage, with a large
> carry-over of dead trees as a legacy of snags and logs in the
> regenerating forest....natural ecological dynamics are largely
> preserved because fire suppression has been effective for less
> than one natural fire cycle.   Thinning for restoration does not
> appear to be appropriate in these forests []. *Efforts to*
> *manipulate stand structures to reduce fire hazard will not only*
> *be of limited effectiveness [] but may also move systems away*
> *from pre-1850 conditions to the detriment of wildlife and*

*watersheds*.

57. Likewise, Graham et al (2004) states:

> Most important, the fire behavior characteristics are strikingly different for cold (for example, lodgepole pine, Engelmann spruce, subalpine fir), moist (for example, western hemlock, western redcedar, western white pine), and dry forests []. Cold and moist forests tend to have long fire-return intervals, but fires that do occur tend to be high-intensity, stand-replacing fires. Dry forests historically had short intervals between fires, but most important, the fires had low to moderate severity.

58. Additionally, literature heavily cited in the EIS (Graham et al 1999)(emphases added) finds that "crown thinning" will not reduce crown fires in lodgepole/subalpine fir forest:

> Depending on the forest type and its structure, thinning has both positive *and negative impacts on crown fire potential*. . . . Selection thinning and crown thinning that maintain multiple crown layers, along with individual tree selection systems, *will not reduce the risk of crown fires* except in the driest ponderosa pine **(Pinus ponderosa** Dougl. ex Laws.) forests. . . .Crown thinning, or thinning from above, reduces crowding within the main canopy. Dominant and codominant trees are removed to favor residual trees in these same classes. This method is often used to remove selected species in the dominant and codominant crown classes that are competing with more desirable species [].

59. The EIS states: "We are not attempting to recreate a condition in this project that is based on a view of the past. . . .The intent is not to recreate a particular historic condition."

60. The Forest Service admits that at the scale of Timber Compartments 709 and 710, i.e. the analysis area for the Project, "this project will not lower the probability of [stand replacing or mixed severity] fire nor the amount of acres burned."

61. The Forest Service predicts that the most the Project will do is – within 1/4 mile of an individual unit – create a 26% to 35% lower probability of stand replacement or mixed severity fire within the next 10 to 20 years."

62. The Forest Service concedes that the Project will not stop "catastrophic fire," i.e. stand-replacing fire, in the area.

63. The Forest Service recognizes that even the most intensive fuel treatment may be rendered ineffective by the dynamics of large, extreme wildfire behavior.

64. The Forest Service concedes its fire risk reduction estimates and representations do not include extreme fire conditions.

65. Thus, even after Project implementation, the Forest Service predicts that under severe weather conditions, a wildfire would still cause 80-90% mortality.

66. Moreover, the Forest Service concedes that the Project will *increase* the fire risk in the short term with "flashy fuels" until slash is piled and burned: "We recognize there may be a risk for a short duration following treatment due to

fuels in landing piles and hand piles."

67.    Additionally, the Forest Service concedes that by opening the forest canopy and encouraging grass to grow, for the longer term, there could be a greater chance of a fast moving fire with high rate of spreads. Wind has more influence on fire spread and rate in a more open canopy configuration, than in the existing closed canopy in the Project area.

68.    The Forest Service concedes: "Thinning can increase the rate of fire spread. Thinning creates more open stands that tend to allow higher wind speeds at the surface that tend to dry fuels more compared to dense stands."

69.    According to Graham et al (2004), thinning may also increase the likelihood of wildfire ignition in the type of forests in this Project area:

> The probability of ignition is strongly related to fine fuel moisture content, air temperature, the amount of shading of surface fuels, and the occurrence of an ignition source (human or lightning caused) []. Stand structure strongly influences all these factors. There is generally a warmer, dryer microclimate in more open stands (fig. 9) compared to denser stands []. Dense stands (canopy cover) tend to provide more shading of fuels, keeping relative humidity higher and air and fuel temperature lower than in more open stands. Thus, dense stands tend to maintain higher surface fuel moisture contents compared to more open stands []. More open stands also tend to allow higher wind speeds that tend to dry fuels compared to dense stands []. These factors may *increase probability of ignition in some open canopy stands compared to dense canopy stands*.

70. The Forest Service concedes that home ignitability (combustible material and design), rather than wildland fuels, is the principal cause of home losses during wildland/urban interface fires.

71. The Forest Service concedes that extensive wildland vegetation management does not effectively change home ignitability.

72. The Forest Service's own research scientist states: "It may not be necessary or effective to treat fuels in adjacent areas in order to suppress fires before they reach homes; rather, it is the treatment of the fuels immediately proximate to the residences, and the degree to which the residential structures themselves can ignite that determine if the residences are vulnerable."

73. Within the Project analysis area, landowners have implemented only 39 acres of fuel reduction projects within Timber Compartment 709, and 0 acres with Timber Compartment 710. The Forest Service refused to provide a map of these actions in the Project EIS.

GRIZZLY BEAR

74. Approximately 50% of the analysis area is Forest Plan Management Area 13, which is to be primarily managed for the grizzly bear according to the Forest Plan: "This management area consists of forested, occupied grizzly bear habitat. The productive Forest lands are available for timber harvest *provided*

17

*grizzly bear habitat objectives are met.*" (Emphasis added).

75.    In the Forest Plan standards section for Management Area 13, the Forest Plan prohibits commercial thinning in this area: "No commercial thinning is planned."

76.    Additionally, all timber compartments in Management Area 13 must have at least 30% old growth habitat.

77.    The timber compartments in the Project area within Management Area 13 are Timber Compartments 709 and 710.

78.    Timber Compartment 709 is 16,321 acres and currently has 2,162 acres of old growth habitat.

79.    Thus, Timber Compartment 709 is 13% old growth forest.

80.    Timber Compartment 710 is 16,168 acres and currently has 5,654 acres of old growth habitat.

81.    Thus, Timber Compartment 710 is 35% old growth forest.

82.    Instead of conserving all old growth in Timber Compartment 710 to make up for the 2,734 acre deficit in Timber Compartment 709, the Project allows 495 acres of old growth logging in Timber Compartment 710, which will result in 32% old growth in that compartment.

83.    Also common in the analysis area are Forest Plan  Management Areas 15

(20%) and 4 (23%). Both of these areas also emphasize grizzly bear conservation.

84. The EIS states that the appropriate analysis area for grizzly bears is the "Bear Management Subunit" and that this spatial unit was "used for effects analyses, as well as to evaluate the proposed action for compliance with applicable direction" for grizzly bears.

85. The Project is located within the Yellowstone Grizzly Bear Recovery Zone within the Henry's Lake #2 Bear Management Subunit.

86. The Project area is also located within "Management Situation 2" or MS-2 lands.

87. A portion of the Henry's Lake #2 Bear Management Subunit is located on the adjacent Caribou-Targhee National Forest in Idaho.

88. The Grizzly Bear Compendium (IGBC 1987) summarized impacts to bears resulting from high road densities as reported in the literature. These impacts include avoidance/displacement of grizzly bears away from roads and road activity, changes in grizzly bear behavior, habitat loss, modification and fragmentation due to roads and road construction, and direct mortality form road kills, illegal harvest and management control.

89. The Bear Management Subunit in the Project area has the highest road

density in the Yellowstone Grizzy Bear Recovery Zone, in part due to past logging activities.

90. The Project area is characterized by an abundance of open and restricted motorized access routes, most of which were originally constructed to facilitate timber harvest but are now used primarily for recreational and administrative uses other than timber harvest.

91. Nonetheless, the Project area and adjacent lands provide suitable habitat for grizzly bears.

92. The Forest Service states that "[n]o estimates are available for the number of grizzly bears using the project area, but they are known to regularly occur within and adjacent to the project area."

93. The EIS represents that the population trend for Yellowstone grizzly bears is increasing.

94. The best available science from the Interagency Grizzly Bear Study Committe, Haroldson et al (2012), IGBST (2012),  indicate the following:

    a.    44 Yellowstone grizzly bear deaths were documented in 2011;

    b.    Both independent males and females exceeded mortality limits in 2011;

    c.    Grizzly bear fecundity (female cub production) is declining

inside the Recovery Zone, and the primary driver of that decline is probably whitebark pine losses;

d.     Juvenile grizzly bear survival rates are declining;

e.     Subadult grizzly bear survival may be declining;

f.     Inside the Recovery Zone, "the population increase that occurred during 1983-2002 had evidently slowed or stopped during 2002-2011;"

g.     The growth rate of grizzly bears within the Recovery Zone has declined; and

h.     The population of grizzly bears outside the Recovery Zone continues to decline. This decline was previously noted in Schwartz et al (2006).

95.     The Forest Service concedes that the Project would involve temporary access route construction within occupied grizzly bear habitat, and may therefore increase the potential for displacement of bears from important habitat and increase risk of grizzly bear mortality.

96.     The Forest Service also concedes that grizzly bears are known to be sensitive to the effects of human activities. Noise and human presence associated with proposed fuel reduction treatments could produce disturbance factors that

21

could displace grizzly bears from the Project area, or could alter natural behavior patterns of bears in the area.

97.     Habitat alterations that result from fuel treatments could also influence the way grizzly bears and prey species use the Project area.

98.     In addition to the Project, there is another logging and road construction Project ongoing in the Henry's Lake #2 Bear Management Subunit. The Hebgen Basin Fuels reduction project is ongoing, and contains about 45-90 acres of treatment in the Henry's Lake #2 Bear Management Subunit. The remaining units scheduled for treatment in the Hebgen Basin Fuels project area located in the Henry's Lake #2 Bear Management Subunit, and require some temporary road construction. The Hebgen Basin Fuels units in Henry's Lake #2 would have similar impacts to the Project with respect to grizzly bear habitat alteration.

99.     The Forest Service's "Schedule of Proposed Actions" states that the "Rendezvous Trail Forest Thinning Project" will also be implemented on the Hebgen Lake Ranger District in 2013 and involves "Tractor logging, skid trails, burn slash piles." This project was not disclosed in the Project EIS.

100.    Although the EIS misleadingly states that the Project could impact individual bears or their habitat, but would "not likely have adverse effects on grizzly

bear populations at the planning unit level," in the biological assessment and FWS response letter, the agencies concede that the Project is likely to adversely affect the grizzly bear.

101.    The agencies acknowledge the Interagency Grizzly Bear Taskforce report as the best direction with which to manage roads on federal lands.

102.    The 1998 Interagency Grizzly Bear Taskforce report, Forest Plan Amendment 19, and the biological opinion for Forest Plan Amendment 19 all require the development of motorized access management standards for the Yellowstone Grizzly Bear Recovery Zone. More specifically, those documents, as well as the best available science (Schwartz et al 2010) require quantitative standards that (1) conserve a percentage of habitat as "core" or roadless habitat, (2) place a limit on the percentage of an area with open motorized access routes over 1.0 mile/square mile (OMARD), and (3) place a limit on the percentage of an area with total motorized access routes (TMARD) over 2.0 mile/square mile.

103.    The agencies have developed these forest plan "access amendments" with these three parameters for the two other occupied grizzly recovery zones in the country: the Northern Continental Divide Recovery Zone and the Cabinet-Yaak/Selkirk Recovery Zone.

104.   The Yellowstone Grizzly Bear Recovery Zone is the only remaining occupied recovery zone without these forest plan access amendments.

105.   Open and total motorized access route densities are both high, and secure habitat is found in only a few small, scattered pieces within the Project area.

106.   The EIS predicts that with implementation of the Project, the subunit will have 41.3% OMARD, 31.5% TMARD, and 51.4% core habitat.

LYNX

107.   The Project area is within the Henry's Lake Mountains Lynx Analysis Unit (LAU), which is 52,242 acres.

108.   2,735 acres of this LAU have been logged since 1955; logging prior to 1955 is undisclosed.

109.   The Project will eliminate 1,548 acres of multi-storied habitat for the snowshoe hare, which is the primary prey of lynx.

110.   Cumulatively, Project logging and past logging will eliminate 20% of the multi-storied snowshoe hare habitat in the LAU.

111.   Lynx have not been observed on the Hebgen Lake Ranger District since 1999, but there were multiple reports of lynx prior to that year.

112.   The agencies concede that the Project is likely to adversely affect lynx.

ELK

113. The Project is within Hunting District 361.

114. The Project area provides summer elk range and fall elk habitat.

115. The EIS states: "Hillis et al. (1991) defined security as large blocks (>250 acres) of fall habitat at least ½ mile from an open motorized route."

116. Hillis et al (1991) also states that at least 30% of an analysis unit should be composed of elk security blocks.

117. The Forest Service's MIS analysis paper (Canfield 2011) states that Hillis et al (1991) is the "best science" on the recommended level of elk security.

118. The Forest Service's MIS analysis paper also states: "Thresholds for open route density from the literature include <0.7 miles/square mile (Christensen et al. 1993) where elk are a featured species; <1.9 miles/square mile where elk are one of the primary resource considerations, and less than 1.0/mile/square mile to optimize elk summer use (Canfield et al. 1999)."

119. Actually, the Christensen et al (1993) threshold of less than 0.7 miles/square mile is for "areas intended to benefit elk summer range and retain high use . . . ."

120. Hunting District 361 has a motorized road density of 1.2 mi/sq mi and 24% security as defined by Hillis et al. (1991).

121. This road density fails the summer range thresholds and the security

25

threshold.

122. Timber Compartments 709 and 710 equals 32,489 acres. Within that elk analysis area, open motorized route density is even higher at 1.3 miles/square mile.

123. Additionally, the Forest Service has excluded from its density and security calculations restricted roads that still receive administrative or contractor motorized use.

124. Christensen et al (1993) and Hillis et al (1991) require consideration of all roads that receive motorized use, regardless of whether the road is designated as publicly open or not.

125. The EIS also fails to disclose the increase in road density during Project implementation, including all roads open to any motorized use.

MOOSE

126. The Project area serves as winter range for a small number of resident moose: moose on the east side of the Henry's Lake Mountains utilize a narrow band of limited suitable habitat at the lower elevations along the shoreline of Hebgen Lake during the winter.

127. Habitat important to moose within this winter range area includes lodgepole pine stands with a subalpine fir understory.

128. 2,300 acres of moose winter range have already been logged in the analysis area, including "probably some of the most important areas for moose winter range. . . ." These formerly logged areas do not yet provide the multi-storied conditions necessary for moose winter range.

129. The moose population in the area is "currently stressed" and there is a "declining population trend observed for moose in this area."

130. Population declines in the area were first noticed after the past logging was completed.

131. There are 1,760 acres of suitable moose winter range that currently exist in the analysis area.

132. Thus, the historic moose winter range available in the analysis area was 4,060 acres.

133. Past logging and the logging proposed by the Project will cumulatively eliminate 63.5 % of the moose winter range in the area.

134. After Project implementation, only 36.5% of historic moose winter range will remain.

135. The proposed fuel treatments in these stand types compromise moose winter habitat and may alter moose habitat to unsuitable conditions by removing subalpine fir trees that are preferred browse and/or opening the canopy which

would allow for greater accumulation of snow.

136. Moose in this area were abundant prior to 1968. During the 1970s-1980s, timber harvest (clearcutting) reduced coniferous moose winter range in areas of heavy snow accumulation, thus reducing available winter habitat in Hebgen Basin. The fire season of 1988 resulted in a further reduction of moose habitat.

137. Data from harvest surveys and general observations indicate a declining population trend over the past 15-20 years. As a result, moose viewing opportunities have declined and moose hunting permits have declined over this period in many areas.

138. Winter is a critical time of year for moose because forage quality and availability is low, and energetic costs of moving through deep snow and maintaining body heat in cold temperatures are high.

139. Unlike ungulates in the northern Rocky Mountains that migrate to lower elevation valleys with less snow accumulation, moose often remain at higher elevations with greater snow accumulation.

140. Winter habitat for moose is variable across their range, but always includes concentrations of accessible browse. In the Greater Yellowstone Area, older lodgepole pine forests with subalpine fir understory were found to be heavily

used by moose under such conditions.

141. Subalpine fir is a preferred browse species for moose.

142. Moose select patches with high concentrations of browse to minimize energetic costs of feeding. Snow depths exceeding 45-50" will preclude moose use altogether.

143. The relationship of moose to ecological disturbances in the Greater Yellowstone Area appears to be different. In this area, older lodgepole pine stands are among the most important wintering areas. There is little or no moose use of lodgepole pine stands <100 years old, and highest use of lodgepole pine stands >300 years old during mid-late winter.

144. Disturbance processes that have reduced overstory canopy cover have likely resulted in loss of moose habitat within the Project area.

145. The Forest Service's statement in the EIS that "[a]ccording to Tyers (2010) (and referred to on pg. 130), there is no evidence that moose are declining, when viewed at larger spatial scales than the project level" is a clear misrepresentation of the record. Likewise, the statement in the Record of Decision that "the moose population is stable at the local and larger scales" misrepresents the record. Tyers (2010) states: "moose are in decline on the Gallatin Forest, as well as across Montana. That decline has also been

noticed in the general project area . . . ."

WOLVERINE

146. Wolverines are proposed for listing under the Endangered Species Act.

147. Wolverines may be present in the Project area.

148. Radio-collared wolverine records shows multiple recent detections of wolverines in the Project area, including within or close to proposed units 1, 2, 5, 6, 11, 12, 14, 15, 17, 26A, 29, 30A, 31 and 32.

149. Wolverines use habitat ranging from Douglas-fir and lodgepole pine forest to subalpine whitebark pine forest (Copeland et al 2007).

150. Roads result in direct mortality to wolverines by providing access for trappers (Krebs et al 2007), and trapping is a major threat to wolverines (Squires et al 2007).

151. Female wolverines avoid roads and recently logged areas, and respond negatively to human activities (Krebs et al 2007).

152. Krebs et al (2007) states that "[f]emale wolverines, in winter and summer, have habitat associations that require careful considerations by land and resource managers. Human use, including winter recreation *and the presence of roads*, *reduced habitat value for wolverines* in our studies." (Emphasis added).

153. Krebs et al (2007) concludes that "precautionary steps to protect habitat should be taken until more focused research examining the behavioral and demographic responses of wolverines to human use is completed to establish thresholds for managers working to resolve conflicts in multiuse landscapes."

154. Winter-killed moose carcasses are occasionally found in the Project area.

155. The Forest Service concedes that the Project "may affect" wolverines.

156. The EIS represents that "the project area is generally below the elevation range frequented by wolverines."

157. The EIS represents that the Project "would not affect essential habitat" for the wolverine.

158. The EIS represents that the Project would not "limit availability of habitat for prey species."

159. The EIS identifies moose and elk as wolverine primary prey.

160. The Forest Service's biological assessment for the Project does not address wolverines.

MANAGEMENT INDICATOR SPECIES

161. The goshawk is an old growth management indicator species for the Gallatin National Forest.

162. Goshawk nest areas are typically characterized by old growth and mature

forest with large trees and high canopy closure.

163. The area surrounding the nest area, the "post-fledgling area," is generally characterized as old growth and mature forest with at least 50% canopy cover.

164. Past timber harvest in this area was fairly extensive and generally removed mature timber through the practice of clearcutting. It will take many more decades before past harvest units begin to provide the tree age and structure needed for goshawks to nest.

165. The EIS states that the goshawk analysis area for the Project (Timber Compartment 709 and 710) is large enough to support about five goshawk breeding pairs.

166. There is a previously active goshawk territory within the Project area, which is called the Trapper Creek home range or territory.

167. A goshawk was first detected in this territory in 2000.

168. Surveys of the territory were then conducted in 2003, 2004, 2007, 2010, 2011, and 2012, and no goshawks were detected.

169. In 2010, an auditory response was heard on July 15, but nothing on the 2nd site visit on August 5. Auditory responses are not conclusive since gray jays can mimic goshawk calls.

170. A search was conducted for the nest in 2012, but no evidence of the nest was found.

171. No breeding northern goshawks were detected within the project area, despite surveys over multiple years.

172. The Forest Service states that "[i]t is possible that goshawks now avoid use of this area due to higher levels of human presence and recreation use since 2003 or due to habitat alteration from mountain pine beetle mortality."

173. The Forest Service also states that "northern goshawks may still occupy the territory and not have responded to survey efforts."

174. The Project allows logging of 986 acres of goshawk habitat, which is 18% of the Trapper Creek home range and includes 776 acres of mature forest.

175. Project activities would additively increase the amount of activity and disturbance in the analysis area, which may render some areas unsuitable for nesting during implementation.

176. The EIS states that "[g]oshawks may never nest in the project area."

177. The EIS states:

> During the original Lonesome Wood Vegetation project, an article regarding goshawk was presented for consideration. The article (Patla 2005) addresses goshawk occupancy rates. Occupancy refers to whether or not a particular goshawk is present in an historical territory. The paper does not address

viability or population trends. This paper was reviewed by a statistician, and the analysis methods were called into question as well as the results (King 2006). The paper has no bearing on population trends within the Greater Yellowstone Area (focused on the Caribou-Targhee National Forest), and especially not on goshawk population dynamics on the Gallatin National Forest, which is about 70% wilderness or roadless and therefore unmanaged. The author acknowledges "…I found no difference in productivity of nesting goshawk pairs between the baseline and recent periods or between timber harvest and undisturbed sites in the recent period." Patla further acknowledges, "I assumed that occupancy results apply to the target population of known nesting areas monitored and may not reflect forest-wide population trends."

178. The EIS discussion does not disclose that Patla (2005) was a peer-reviewed, published article in a scientific journal.

179. The EIS discussion does not disclose that the title of Patla (2005) is "Monitoring Results of Northern Goshawk Nesting Areas in the Greater Yellowstone Ecosystem: Is Decline in Occupancy Related to Habitat Change?"

180. The EIS discussion does not fully and fairly disclose the results in Patla (2005), which found declining goshawk occupancy and indications that the decline was significantly higher in logged areas:

A total of 16 randomly-selected nesting areas, half in undisturbed and half in timber-sale project areas, were surveyed each year. Occupancy in 1998-2002 averaged 34%, which was significantly lower than the 61% measured at these nesting areas

from 1992-95 (baseline period) using similar survey methods and effort. . . . .Occupancy at nesting areas located in past timber- harvest areas in the recent period was significantly lower compared to those in less disturbed habitat (22% occupancy versus 45%, respectively) suggesting that occupancy may be influenced by the long term effects of timber-management practices.

181. The EIS discussion does not disclose that Patla (2005) was a research study that was conducted for the purpose of determining population trend on the adjacent Caribou-Targhee National Forest because the forest plan for that National Forest uses occupancy rates as the measure to determine population trend.

182. The EIS discussion does not disclose that "King (2006)" is a two page letter from a Forest Service employee, which was not published in any peer-reviewed scientific journal.

183. The EIS discussion does not disclose that the "King (2006)" letter conducts a different calculation with Patla (2005)'s results and concludes that under that different calculation: "This is a weaker test result . . . but still indicates some support for rejecting the null hypothesis of no difference in occupancy between harvested and undisturbed areas."

184. In other words, there is no dispute that the results of Patla (2005) show a decline in goshawk occupancy that is greater in logged areas and is occurring

on the Caribou-Targhee National Forest, which is adjacent to the Gallatin National Forest, and in fact is included in the grizzly bear analysis area for this Project.

185.    The goshawk is ranked "S3" in Montana, which indicates that the goshawk is potentially at risk because of limited and/or declining numbers, range, and/or habitat.

186.    The primary influences on the amount, distribution and suitability of goshawk habitat are management treatments in forest vegetation (e.g., thinning, timber harvest) and stand-replacing wildfires.

187.    Although some sources speculate that mountain pine beetle mortality may reduce goshawk habitat, data are lacking to support that theory.  In one study, goshawks continued to nest successfully in lodgepole pine forests where up to 80% of the overstory trees were killed.

188.     In 2010, all data on prior goshawk surveys on the Gallatin National Forest were compiled and centralized into a spreadsheet; known nests were entered into the NRIS wildlife national database.

189.    Subsequently, 18 known nesting territories were resurveyed in 2010 to determine occupancy; goshawks were only detected in 8 out of the 18 known territories.

190. Thus, the only nest occupancy study conducted on the Gallatin National Forest indicates a decline in occupancy by 44%, which is similar to Patla (2005)'s results on the adjacent Caribou-Targhee National Forest.

191. This decline in occupancy was not disclosed to the public in the EIS.

192. Instead, the EIS represents that " a monitoring report (Canfield 2011) was prepared to summarize forestwide monitoring efforts and population changes of indicator species. This report indicated that the northern goshawk population on the Gallatin National Forest was stable to increasing." The Record of Decision repeats this conclusion.

193. The Forest Service's MIS analysis paper (Canfield 2011) does not find that that the population trend for goshawk is stable to increasing; it actually states that goshawk "population trends cannot be determined from existing data."

194. Another old growth management indicator species on the Forest is the pine marten.

195. Martens selected  moist and structurally complex habitats during the winter. Their winter habitat selection is for forest with high canopy cover, large live trees, large deadfall, and abundant vegetation in the understory.

196. Martens seldom use landscapes heavily impacted by logging.

197. Past timber harvest, particularly clear-cutting, has resulted in a reduction of

available pine marten habitat.

198. Pine marten are known to occur in the Project area and one was observed in July 2010 during field review of the Project area.

199. However, the Forest Service did not conduct any Project-specific surveys for pine marten.

200. The Forest Service does not know the existing population of pine marten Forest-wide or in the Project area.

201. On a state-wide basis, as of 2009, the pine marten population trend was either declining or stable.

202. In contrast, the Record of Decision misrepresents the population trend as "stable to increasing."

203. The EIS does not disclose the population trend for pine marten on the Gallatin National Forest.

204. The Project will eliminate 1,293 acres of marten habitat.

205. The Project will further reduce the availability of habitat in conjunction with past timber harvest.

## VII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

The Project and the agencies' analyses, actions ,and omissions regarding

**the grizzly bear violate the ESA, NFMA, NEPA, and the APA.**

206.  All previous paragraphs are incorporated by reference.

207.  During an ESA consultation, if the agencies agree that an activity is likely to
      adversely affect an ESA-listed species, FWS must prepare a biological
      opinion to ensure that the activity will not jeopardize the species.

208.  A biological opinion must use the best available science at the time of
      consultation for the activity.

209.  The agencies agree that the Project is likely to adversely affect the grizzly
      bear.

210.  FWS did not prepare a biological opinion for the Project to ensure that the
      Project will not jeopardize the grizzly bear.

211.  FWS did not issue an incidental take statement for grizzly bears for the
      Project.

212.  Instead of preparing a biological opinion and incidental take statement for the
      Project, the agencies rely on a six year old biological opinion for a Forest-
      wide road management plan ("Travel Plan").

213.  The Travel Plan biological opinion is not based on the best available science
      and fails to consider important factors. For example, the Travel Plan fails to
      address the most recent information on Yellowstone grizzly bear mortalities,

survival rates, and growth rates. Additionally, the road density figures in the Travel Plan are based upon a stale and inaccurate model, which the Forest Service admits underestimated road density in the Forest.

214. The Travel Plan biological opinion assumes that if roads are managed in accordance with the Travel Plan, within the Henry's Lake #2 Bear Management Subunit, *OMARD will be no greater than 25.1%, TMARD will be no greater than 19.0%, and core (secure habitat) will be no less than 62.5%.*

215. The incidental take statement for the Travel Plan sets those access management standard percentages (25.1% OMARD/19.0 % TMARD/62.5% core) as the surrogate level for permitted take in the Henry's Lake #2 Bear Management Subunit: "we will use the proposed OMARD, TMARD and security core percentages listed in Table 6 as the surrogate measures within the recovery zone."

216. The conclusions and analysis in the Travel Plan biological opinion regarding jeopardy and permitted incidental take assume that the Henry's Lake #2 Bear Management Subunit will be managed for 25.1% OMARD, 19.0% TMARD, 62.5% core: "The Forest shall follow . . .standards related to OMARD, TMARD, and secure habitat."

217. To the contrary, the best available science – which is based on a "more sophisticated software that contains much more accurate algorithms for assessing route density" – now indicates that implementation of the Travel Plan will not result in the Henry's Lake #2 Bear Management Subunit achieving 25.1% OMARD, 19.0% TMARD, 62.5% core.

218. In 2009, a much improved method for estimating route density was introduced into the spatial modeling algorithms in the grizzly bear access model. These software developments offer a suite of more powerful geo-processing tools that greatly enhance the accuracy of motorized route density estimates.

219. The newer, more accurate algorithms show higher road densities and less core than previously assumed.

220. Thus, according to the Project's biological assessment, implementation of the Travel Plan will only result in the Henry's Lake #2 Bear Management Subunit achieving 41.3% OMARD, 30.9% TMARD, 51.8% core.

221. Although the percentages are different in part due to a different analysis unit (Gallatin Forest lands only vs Gallatin and Caribou-Targhee Forest lands), the new and more accurate algorithms/model account for the majority of the difference in the numbers. This is evident because the TMARD in 1999 for

the Gallatin Forest lands only in the Henry's Lake #2 Bear Management Subunit was 29.0%, but for all lands in the Henry's Lake #2 Bear Management Subunit in 1998, TMARD was 28.1%. Thus, changing the size of the analysis area – alone – did not dramatically alter the TMARD estimate in the Henry's Lake #2 Bear Management Subunit. In contrast, the DEIS indicates that existing TMARD under the older, less accurate model is 26.6%, and under the newer, more accurate model is 33.5%.

222. After analysis under the newer, more accurate model, it is clear that the Project area does not and will not comply with the 25.1% OMARD, 19.0% TMARD, 62.5% core surrogate incidental take measures from the Travel Plan biological opinion.

223. The FWS did not issue an additional incidental take permit for the Project to address this failure to comply with the Travel Plan incidental take permit.

224. Additionally, for the Project analysis, the FWS did not assess whether achieving only 41.3% OMARD, 30.9% TMARD, 51.8% core in the Henry's Lake #2 Bear Management Subunit complies with the best available science for grizzly bears and ensures that management will not result in jeopardy.

225. By way of comparison, the access management standards for the Northern Continental Divide Ecosystem grizzly bears are no more than 19% OMARD,

no more than 19% TMARD, and at least 68% core. The access management

standards for the Selkirk/Cabinet-Yaak grizzly bears are no more than 33%

OMARD, no more than 26% TMARD, and at least 55% core . The original

access management standards for Yellowstone grizzly bears in the Henry's

Lake #2 Bear Management Subunit, which were presented to the public in the

NEPA analysis and ESA consultation for the Travel Plan, were 25.1%

OMARD, 19.0% TMARD, and 62.5% core. Those standards were within

range of the standards from the two other occupied grizzly ecosystems. The

newly presented standards – 41.3% OMARD, 30.9% TMARD, and 51.8%

core – for the Henry's Lake #2 Bear Management Subunit are not within that

range.

226.   The agencies' failure to complete ESA consultation for the Project, including

a biological opinion with a jeopardy determination and an incidental take

statement, before authorizing and implementing the Project violates the ESA

and is arbitrary and capricious.

227.   The agencies' failure to take a hard look at this issue violates NEPA. In

particular, 40 C.F.R. §1502.16 requires the Forest Service to disclose the

Travel Plan surrogate take standards to the public in the "Environmental

Consequences" section of the EIS, and discuss how those standards may

conflict with Project implementation. The EIS does not disclose the 25.1% OMARD, 19.0% TMARD, 62.5% core standards or conduct this required analysis.

228.    These legal violations are compounded by the agencies' failure to develop and implement access management amendments for the Greater Yellowstone Ecosystem. The Forest Service admits that "Amendment 19 directs the Forest to adopt Greater Yellowstone Area-wide standards when they become available," but it does not disclose whether the agencies have even started that process yet. Instead, the agencies seem intent to indefinitely ignore that requirement.

229.    The best available science indicates that access management standards that address open route densities, total route densities, and core habitat are necessary for grizzly bear habitat (IGBC 1998), including for Yellowstone grizzly bears (Schwartz et al 2010). The Greater Yellowstone Ecosystem is the only occupied grizzly ecosystem that is failing to comply with this requirement.

230.    Additionally, the Project violates NFMA because it does not comply with Forest Plan Amendment 19, which prohibits any increase (even a temporary one) in open or total motorized route densities, and prohibits any decrease in

core habitat.

231. In addition to reopening/reconstructing 2.8 miles of old roads for Project use, the Project also allows construction of six additional miles of road for the Project. This increase in roads violates A19.

232. Additionally, the "very little reduction in secure habitat" posed by the Project is still a decrease, which also violates A19.

233. The Forest Service argues that there will be no increase because it will replace the gates on two other roads with two "permanent barricades." This action is irrelevant to the A19 standard because the roads are considered "restricted" in both instances; the only way to eliminate a road from density calculations is to obliterate and reclaim the entire road.

234. Total motorized route density calculations must include all open roads, all restricted roads, all roads not meeting all reclaimed/obliterated road criteria, and all motorized trails.

235. Forest activities that involve new motorized access route construction must be designed so as not to increase existing total motorized access route densities within Bear Management Unit subunits by reclaiming a corresponding or greater amount of roads and motorized trails within that analysis area.

236. A road that only has a physical obstruction is a "restricted road" not a

reclaimed/obliterated road.

237. The Forest Service acknowledges the gated/barricaded roads will not be obliterated: "We made no claim that physical barricades [on the roads] will qualify as obliterated roads as per Amendment No. 19."

238. To the contrary, these blocked roads may still be used as motorized trails by users accessing the road from a different connection point.

239. The Project also violates NEPA and Forest Plan Appendix G because the EIS does not disclose and indicate compliance with the requirement to "provide compatibility without jeopardizing grizzly population" and to conduct formal consultation with FWS if a project "may affect" grizzly bears.

240. The Project further violates the Forest Plan Management Area 13 prohibition against commercial thinning in grizzly bear habitat.

241. The Project also violates NEPA and Forest Plan Appendix H because the EIS does not disclose and indicate compliance with (1) the requirement to prohibit adverse impacts to grizzly bears; (2) the compatibility requirement; (3) the MS-2 duration limits that prohibit timber sale activities that last for more than five years (Project implementation will last 8-12 years); (4) the MS-2 duration limit requiring at least two years of inactivity following one to three years of activity (Forest Service is implementing logging and temporary road

construction in 2012 in this Bear Management Subunit for the Hebgen Basin Fuels Reduction Project); and (5) the MS-2 requirement for a 5,000 acres security area immediately adjacent to the Project area.

242. The agencies are violating Section 9 because there is no take permit that covers the Project's incidental take of grizzly bear.

## SECOND CLAIM FOR RELIEF

### The Project and the agencies' analyses, actions ,and omissions regarding the wolverine violate the ESA, NFMA, NEPA, and the APA

243. All previous paragraphs are incorporated by reference.

244. Wolverines are proposed for listing under the ESA and will be listed before or during Project activities.

245. Wolverines may be present in the Project area and the Project may affect them.

246. The Final Rule for ESA Section 7 consultation regulations requires that the action agency address proposed species in a biological assessment:

> A biological assessment contains information concerning listed *or proposed species* or designated or proposed critical habitat *that may be present* in the action area *and an evaluation of any potential effects of the action on such species and habitat.* A biological assessment should be used in determining whether formal consultation or a conference is required.

51 Fed. Reg. 19940 (June 3, 1996)(emphasis added).

247. The Forest Service prepared a biological assessment for lynx and grizzly bears but did not include the wolverine in the biological assessment for the Project.

248. The agencies' failure to include the wolverine in the biological assessment for the Project violates the ESA and APA and is arbitrary and capricious.

249. After the Record of Decision was signed, the Forest Service prepared an "Addendum to Lonesome Wood 2 FEIS" to "review effects of the project on wolverine and provide an effects determination this is appropriate for a proposed species."

250. In violation of NEPA, the Forest Service did not allow a public comment period for its supplemental EIS analysis on the Project.

251. ESA, NFMA, and NEPA require that the agencies use the best available science and insure the scientific accuracy and integrity of their analyses.

252. The best available science includes: (1) records of detections of radio-collared wolverines in the Project area, including within or close to proposed units 1, 2, 5, 6, 11, 12, 14, 15, 17, 26A, 29, 30A, 31 and 32; (2) acknowledgment that wolverines use habitat ranging from Douglas-fir and lodgepole pine forest to subalpine whitebark pine forest (Copeland et al

2007); (3) acknowledgment that roads result in direct mortality to wolverines by providing access for trappers (Krebs et al 2007), and trapping is a major threat to wolverines (Squires et al 2007); and (4) acknowledgment that female wolverines avoid roads and recently logged areas, and respond negatively to human activities (Krebs et al 2007).

253. Krebs et al (2007) states that "[f]emale wolverines, in winter and summer, have habitat associations that require careful considerations by land and resource managers. Human use, including winter recreation *and the presence of roads*, *reduced habitat value for wolverines* in our studies." (Emphasis added).

254. Krebs et al (2007) concludes that "precautionary steps to protect habitat should be taken until more focused research examining the behavioral and demographic responses of wolverines to human use is completed to establish thresholds for managers working to resolve conflicts in multiuse landscapes."

255. The Forest Service's wolverine analysis does not address the impact of road density (and other human disturbance impacts) on wolverines in the Project area, much less set road density thresholds for wolverine management.

256. The Forest Service's analysis also fails to fully disclose wolverine presence in the Project area.

257. The agencies' decisions to allow the construction of six miles of new roads plus the reopening/reconstruction of 2.8 miles of closed roads, for a Project that will last 8-12 years, in habitat that is already significantly degraded by high road density, and is within the range of two threatened species for which road density is a significant threat, is arbitrary and capricious and violates the ESA, NEPA, NFMA, and the APA.

258. The agencies are violating Section 9 because there is no take permit that covers the Project's incidental take of wolverine.

THIRD CLAIM FOR RELIEF

The Project, the Lynx Direction, and the agencies' analyses, actions ,and omissions regarding the lynx violate the ESA, NFMA, NEPA, and the APA.

259. All previous paragraphs are incorporated by reference.

260. During an ESA consultation, if the agencies agree that an activity is likely to adversely affect an ESA-listed species, FWS must prepare a biological opinion to ensure that the activity will not jeopardize the species.

261. A biological opinion must use the best available science at the time of consultation for the activity.

262. The agencies agree that the Project is likely to adversely affect the lynx.

263. FWS did not prepare a biological opinion to ensure that the Project will not

jeopardize the lynx.

264.    FWS did not prepare an incidental take statement for lynx for the Project.

265.    Instead of preparing a biological opinion and incidental take statement for the Project, the agencies rely on a five year old biological opinion for the regional Lynx Direction, which was amended to the Forest Plan in 2007.  This regional biological opinion for a different activity cannot and does not adequately substitute for a biological opinion for this Project.

266.    In fact, the Lynx Direction biological opinion states: "*site specific consultation (second tier) is required* for actions that may affect listed species, including those conducted under the exceptions and exemptions." (Emphasis added).

267.    The agencies' failure to complete ESA consultation before authorizing and implementing the Project violates the ESA and is arbitrary and capricious. The broad-scale regional biological opinion relied upon does not address all the relevant factors for the Project and is not based on the best available science.

268.    Additionally, neither the Project EIS nor the Biological Assessment for lynx addresses whether the Project complies with Standard ALL S1 from the Lynx Direction.

269. Projects involving "fuels management" in the "wildland urban interface" are not exempt from compliance with Standard ALL S1.

270. Additionally, the regional Lynx Direction itself violates NEPA, NFMA, the ESA, and the APA.

271. The Lynx Direction does not apply the best available science, which requires protection of winter lynx habitat. The Lynx Direction only contains quantitative standards to protect snowshoe hare habitat, which is different than winter lynx habitat.

272. Even if the Lynx Direction was adequate, the Project will violate Lynx Direction standards Veg S5 (prohibition against precommercial thinning in snowshoe hare habitat) and Veg S6 (prohibition against reduction of snowshoe hare habitat in mulitstory mature or late-successional forest).

273. These violations would normally violate both NFMA and the ESA, but the agencies exempted this Project from those standards in accordance with the Lynx Direction's allowance that permits the agencies to violate the Lynx Direction standards until they have a reached threshold level of destruction of 6% of all lynx habitat across the Forest. Under the Lynx Direction, subject to the 6% destruction limit, the Forest Service can violate the Lynx Direction if a project can be deemed to be "fuels management" within the "wildland

urban interface."

274. The Lynx Direction's decision to exempt 6% of lynx habitat on the Forest from the Lynx Direction standards is arbitrary and capricious and has no scientific basis. In fact, the agencies acknowledge that even with "business as usual" logging operations, the Forest Service would not reach that level of logging. Thus, the 6% limit will not actually limit anything.

275. This fact is critical because the primary reason that lynx had to be listed under the ESA is the Forest Service's failure to conserve lynx habitat on National Forests. By setting a logging limit higher than the amount of logging the Forest Service normally completes, the agencies ensure that the Forest Service will continue to fail to adequately conserve lynx habitat.

276. When the agencies' arbitrary numeric exemption is viewed in addition to the fact that the Lynx Direction standards do not actually attempt to conserve and recover lynx habitat, but instead simply allow a certain percentage of continued incremental destruction of that habitat (in some cases 30% destruction), it is clear that the Lynx Direction does not satisfy the legal mandate to conserve and recover the lynx population.

277. The Forest Service admits that it has no intention to restore and recover lynx habitat: "There is no requirement to promote habitat potential for [] lynx."

278. Additionally, the 6% destruction of lynx habitat may be significantly concentrated in one area, which will have a greater impact on meta-populations than acknowledged by the agencies. For example, in the Lynx Analysis Unit in the Project area, 22% of the lynx habitat available to logging will be destroyed at the close of the Project. This logging is concentrated in relatively lower-elevation, mature and dense forests on gentle slopes, which is preferred habitat for lynx.

279. The Lynx Direction purportedly addresses the concentration of this destruction by limiting logging to three adjacent Lynx Analysis Units, but the size of Lynx Analysis Units is so large, and not based on biological requirements of lynx, that the restriction is not biologically meaningful to metapopulations of lynx.

280. The agencies' failures to adequately address these issues violates NFMA, NEPA, APA and ESA. The agencies are violating Section 9 because there is no take permit that covers the Project's incidental take of lynx.

FOURTH CLAIM FOR RELIEF

The Project and the Forest Service's analyses, actions ,and omissions regarding elk and moose violate NFMA, NEPA, and the APA

281. All previous paragraphs are incorporated by reference.

282. The Forest Plan has a standard that requires the Forest Service to manage moose winter range to meet the forage and cover needs of moose.

283. The moose population is declining across the State of Montana, in the Gallatin National Forest, and in the Project area.

284. The Project will remove 277 acres of moose winter range, in addition to 2,300 acres that have already been removed. Thus, after the Project, only 36.5 % of historic moose winter range will remain.

285. The plain language of the Forest Plan standard requires that all moose winter range must be managed meet the cover and forage needs of moose. There is no numeric threshold to apply that allows the agency to eliminate cover and forage on a particular percentage of moose winter range.

286. In violation of NFMA, the Project violates this Forest Plan standard for protection of moose winter range. Alternatively, or in addition, the agency's decision not to put in place a numeric threshold for moose winter range retention, but instead to retain only what will incidentally remain after any particular logging project, is arbitrary and capricious.

287. In violation of NEPA, The EIS misrepresents and fails to fully inform the public regarding the moose population in the Gallatin National Forest. The EIS states: "According to Tyers (2010), there is no evidence that moose are

declining, when viewed at larger spatial scales than the project level." To the contrary, the cited document, Tyers (2010), states that "moose are in decline on the Gallatin Forest, as well as across Montana."

288. Forest Plan Wildlife and Fish General Standard #11 requires that "[r]oads and forest cover will be managed to provide habitat security . . . ."

289. The EIS discusses Hillis et al (1991) as the best available science on habitat security for elk.

290. Hillis et al (1991) states that 30% of an area should provide elk security. The EIS does not disclose this threshold to the public.

291. The EIS discloses that the analysis area for the Project has only 24% habitat security.

292. The EIS does not disclose that the Project fails the threshold for elk security.

293. Another measure of appropriate road density can be found in the project file, which discloses that less than 0.7 miles/square mile or less than 1.0 miles/square mile of road is the appropriate limit for elk summer range. The EIS does not disclose this threshold or the fact that the Project area fails this threshold.

294. The Project allows the reopening/reconstruction of 2.8  miles of closed roads and the new construction of six miles of roads for the Project, which will last

for 8-12 years. Thus, road density will increase and security will be further degraded during Project implementation.

295. In violation of NFMA and NEPA, the Project violates the Forest Plan standard for elk security and the EIS fails to take a hard look as the issue and adequately inform and disclose key scientific thresholds to the public.

FIFTH CLAIM FOR RELIEF

 The Project and the Forest Service's analyses, actions ,and omissions regarding old growth management indicator species violate NFMA, NEPA, and the APA

296. All previous paragraphs are incorporated by reference.

297. The Forest Plan includes a standard to monitor population trends of management indicator species. This standard exists for the purpose of ensuring that the Forest Service is meeting the Forest Plan goal to "provide habitat for viable populations of all indigenous wildlife species . . . .".

298. The Project EIS represents: "The GNF FP incldes a standard that requies monitoring of MIS to determine population change. According to the FP, the forest is required to determine these population trends and their relationships to habitat changes at 5 year intervals."

299. The northern goshawk and pine marten are management indicator species for old growth dependent species.

300. The Forest Service does not disclose the number of goshawks or pine martens required for a viable population.

301. The best available science indicates that 5,000 to 7,000 individuals are necessary for a viable population (Reed et al 2003, Traill et al 2010).

302. Although the Forest Service may avoid monitoring population trends in some cases if it has substituted a "habitat proxy" that it is measuring, in this case the Project EIS states that it does not use a habitat proxy for old growth dependent management indicator species: "The Gallatin National Forest has not determined a threshold for the amount of old growth, below which, populations of dependent species would no longer be viable. A level of mature and old growth forest necessary to sustain viable populations of dependent wildlife species in the area was therefore not calculated as part of the analysis for this project." Likewise, the Forest Service states: "The level of winter habitat necessary to maintain pine marten was [] not calculated . . . ."

303. Additionally, the Forest Service cannot use a habitat proxy if the predicted results do not reflect reality. In this case, any reliance on a habitat proxy for goshawk and pine marten would be unlawful because goshawks can no longer be found in the area, and only one pine marten was seen in the area.

304.    The most recent monitoring report from the State of Montana indicates that, as of 2009, pine marten may be either declining or stable.

305.    The EIS is misleading and misrepresents the goshawk's status on the Gallatin National Forest. The EIS represents that the goshawk population trend is increasing; in contrast, the agency's analysis document in the project file (Canfield 2011) indicates that the population trend is *unknown*. Moreover, the Canfield (2011) analysis document indicates that when 18 goshawk nests across the Forest were recently surveyed, only 8 were still occupied. Thus, the only available evidence indicates that the population trend may be declining. The EIS does not disclose this survey result or discuss its implications.

306.    Additionally, the only peer-reviewed, published scientific study in a wildlife management scientific journal that addresses goshawk population trend in the Greater Yellowstone Area (Patla 2005), which was conducted in the adjacent Caribou-Targhee National Forest, also found declining goshawk occupancy, which was likely correlated to logging. Patla (2005) states that the way the Forest Service measures population trend on the Caribou-Targhee National Forest is by monitoring goshawk nest occupancy.

307.    The EIS does not fully and fairly disclose the results of Patla (2005), as

discuussed above.

308. In 2009, the State of Montana classified the goshawk as "S3" in part because of potentially declining population.

309. Despite concerns about declining goshawk occupancy/population trend in the Project area, Gallatin National Forest, Greater Yellowstone Area, and State of Montana, the Project will remove about 1,000 acres of suitable goshawk habitat, including over 400 acres of designated old growth habitat.

310. In violation of NFMA and NEPA, the EIS fails to demonstrate that the Forest Service is monitoring population trends and ensuring the viability of old growth dependent species. Moreover, the EIS fails the NEPA requirements to ensure scientific integrity and accuracy, and fully and fairly inform the public, because the EIS obscures and misrepresents key facts and scientific study results.

## SIXTH CLAIM FOR RELIEF

The Project violates the Roadless Rule and fails to take a hard look at the issue.

311. All previous paragraphs are incorporated by reference.

312. The Roadless Rule states that "[t]imber may not be cut, sold or removed in inventoried roadless areas of the National Forest System, except as provided in paragraph (b) of this section."

313. The Project authorizes tree cutting and removal in an inventoried roadless area within Units 2, 13, 14, and 15.

314. The EIS relies on exemption (b)(1)(ii) for Unit 2. That exemption allows cutting and removal only "[t]o maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, *within the range of variability that would be expected to occur under natural disturbance regimes* of the current climatic period." (Emphasis added).

315. The EIS fails to demonstrate that tree removal in Unit 2 would restore it to within the range of variability that would be expected to occur under natural disturbance regimes.

316. In truth, Unit 2 is not at risk of "uncharacteristic" wildfire, and is currently within its natural range of variability, because stand-replacing wildfire is a natural occurrence in this type of forest, and attempting "fuel treatment" to reduce fire risk will actually result in a *departure* from the natural range of variability in this forest (Schoennagel et al 2004, Brown et al 2004). Thus, the exemption does not apply and tree cutting in this unit violates the Roadless Rule.

317. The EIS relies on exemption (b)(4) for Units 13, 14, 15. That exemption

allows cutting and removal only when "[r]oadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest. Both the road construction and subsequent timber harvest must have occurred after the area was designated an inventoried roadless area and prior to January 12, 2001. Timber may be cut, sold or removed *only in the substantially altered portion* of the inventoried roadless area." (Emphasis added).

318. The portions of Units 13, 14, and 15 within the roadless area do not each have classified roads and prior logging within each unit, thus they are not within the portion of the roadless area where tree cutting may occur. The map for the Project shows that within the roadless area, Units 13 and 15 have no prior roads at all. Additionally, within the roadless area, Unit 14 does have a prior road, but there was no prior logging in Unit 14. The rule requires both a classified road and prior logging within each unit. Accordingly, the exemption does not apply and tree cutting in these units violates the Roadless Rule.

319. The EIS fails to take a hard look at the application of these exemptions to the Project, for the reasons above and including but not limited to, failing to disclose the "roadless characteristics" set forth in the Roadless Rule.

## VIII.  RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A.  Declare that the Project violates the law;

B.  Enjoin implementation of the Project;

C.  Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees under the ESA and/or under EAJA; and

D.  Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 6th Day of May, 2013.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiffs