**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, | CV-13-64-GF-BMM |
| Plaintiffs, | |
| vs. | |
| FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of the Interior, | **ORDER** |
| Defendants. | |

## INTRODUCTION

Plaintiffs challenge the Lonesome Wood II Project in the Gallatin National Forest. The Project involves commercial logging of 1,750 acres, including 495 acres of old growth forest, and an additional 825 acres of potentially commercial logging. The Project also involves 325 acres of slash and/or prescribed burning.

Plaintiffs raise multiple claims concerning the Project's potential violations of the National Forest Management Act, 16 U.S.C. § 1600, et seq., the Endangered

Species Act, 16 U.S.C. § 1531, et seq., and the National Environmental Policy Act, 42 U.S.C. § 4331, et seq. These claims involve potential adverse effects to the grizzly bear, the Canada lynx, and the wolverine.

The parties have submitted cross motions for summary judgment. The Court grants partial summary judgment in favor of Plaintiffs on the adequacy of the biological opinions with regards to the grizzly bear and the Canada lynx. The Court grants summary judgment in favor of Defendants on all other issues.

## STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court will grant summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Anderson*, 477 U.S. at 247-48.

## ANALYSIS

The Administrative Procedure Act authorizes a federal court to review a final agency action. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt*., 273 F.3d 1229, 1235 (9th Cir. 2001). Pursuant to the Administrative

Procedure Act, the Court may "hold unlawful and set aside agency action, findings, and conclusions" that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## 1. Endangered Species Act: Biological Opinions

The Forest Service determined in its biological assessment that the Project likely would affect adversely both grizzly bears and Canada lynx. This determination prompted the Forest Service to initiate formal consultation with the Fish and Wildlife Service (FWS), as required by 50 C.F.R. § 402.14. The regulations require FWS to prepare a biological opinion in response to this formal consultation request. § 402.14(g). The biological opinion must include a detailed discussion of the effects of the action. The biological opinion also must opine as to whether the action likely would jeopardize the continued existence of a listed species. § 402.14(h). FWS's issuance of a biological opinion terminates formal consultation. § 402.14(l).

FWS conducted no new biological opinion to consider the Project's impacts on the grizzly bear or Canada lynx. FWS instead responded with a "confirmation letter" to the Forest Service's request for formal consultation. In this letter, FWS determined that previous biological opinions had analyzed the potential effects of the Project. The "confirmation letter" stated that the 2006 Travel Plan Biological Opinion had analyzed fully the effects to the grizzly bear. The "confirmation

letter" further stated that the 2007 Northern Rocky Mountains Lynx Amendment (Lynx Direction) Biological Opinion had analyzed fully the effects to the Canada lynx. This determination prompted FWS to decline to conduct a new biological opinion for either the grizzly bear or the Canada lynx.

**a. Tiered Biological Opinions**

FWS argues that the Endangered Species Act permits "tiering" of biological opinions. FWS argues that it properly tiered its biological opinions. Plaintiffs do not challenge FWS's ability generally to "tier" biological opinions under the Endangered Species Act. Plaintiffs argue, however, that FWS did not properly tier the biological opinions here.

FWS references a first-tier, programmatic biological opinion in a second-tier biological opinion. *See, e.g., Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1068 (9th Cir.) amended sub nom. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 387 F.3d 968 (9th Cir. 2004). This reference allows FWS to avoid repeating the analysis from the first-tier biological opinion. *Gifford*, 378 F.3d at 1068. FWS conducted no second biological opinion here. FWS instead stated in the "confirmation letter" that the first biological opinion had been sufficient. The Court agrees with Plaintiffs that FWS failed to "tier" biological opinions. The Court must consider whether the Endangered Species Act requires a second biological opinion, or whether the 2006 Travel Plan Biological

Opinion and 2007 Lynx Direction Biological Opinion adequately had analyzed the Project's potential impacts on grizzly bears and Canada lynx.

**b. 2006 Travel Plan Biological Opinion**

The Project includes the creation and use of roads on a temporary basis. Grizzly bears avoid roads. FWS contends that this issue of road access represents the only possible adverse impact to the grizzly bear from the Project. FWS argues that the 2006 Travel Plan Biological Opinion had analyzed fully the road access issues. FWS argues that it would have been needlessly duplicative to require FWS to conduct a new biological opinion that merely restated the 2006 Travel Plan Biological Opinion.

Section 402.14(h)(3) requires a biological opinion to include a jeopardy analysis. FWS conducted no written analysis on whether the Project will jeopardize the grizzly bear. FWS contends that the 2006 Biological Opinion fully analyzed the issue of road access. FWS argues that the jeopardy decision made within the 2006 Biological Opinion may be extended to the Project.

The Ninth Circuit considered whether FWS could rely on a previously conducted biological opinion in making its jeopardy determination in *Gifford*, 378 F.3d at 1068. There FWS first conducted a biological opinion for a National Forest Plan. The Forest Service detailed a method to conserve spotted owls as part of the National Forest Plan.

FWS then conducted six site-specific biological opinions for projects where the Forest Service had implemented the spotted owl conservation strategy created in the National Forest Plan. FWP relied, in part, on the programmatic biological opinion to make its jeopardy determination in each of the site-specific biological opinions. FWS made no jeopardy determination, however, based entirely on the previous programmatic biological opinion. The court noted that FWS had analyzed site-specific data as part of its jeopardy determination. *Gifford*, 378 F.3d at 1067-68.

The court determined that FWS could "permissibly rely, in part" on the biological opinion for the National Forest Plan in formulating its jeopardy determination. *Gifford*, 378 F.3d at 1068. The court used language, however, that limits FWS's ability to tier biological opinions in this manner to the circumstances presented in *Gifford*. The court noted that a National Forest Plan "is not an ordinary government land-management strategy." *Gifford*, 378 F.3d at 1068. The court recognized that the National Forest Plan at issue in *Gifford* already had been approved by the court in previous litigation. *Gifford*, 378 F.3d at 1068.

FWS argues here that it can rely entirely on the jeopardy determination reached in the previous 2006 Travel Plan Biological Opinion instead of conducting a new jeopardy analysis for this Project. *Gifford* allows FWS at most to "rely, in part" on a programmatic biological opinion. *Gifford*, 378 F.3d at 1068. *Gifford*

does not relieve FWS entirely of its duty to analyze site-specific data in reaching its jeopardy determination. *Gifford*, 378 F.3d at 1067-68.

FWS cited five cases to support its argument that it can rely entirely on a previously conducted biological opinion and accompanying jeopardy determination. FWS first points to *Gifford*. FWS conducted six site-specific biological opinions in *Gifford*. FWS relied, in part, on a programmatic biological opinion in making its jeopardy determinations. *Gifford*, 378 F.3d at 1067-68. FWS next points to *Buckeye Forest Council v. U.S. Forest Serv*., 378 F. Supp. 2d 835, 844 (S.D. Ohio 2005). FWS again conducted a site-specific biological opinion in *Buckeye Forest*. FWS's jeopardy determination once again relied, in part, on a programmatic biological opinion. *Buckeye Forest*, 378 F. Supp. 2d at 844.

Here, in contrast, FWS conducted no site-specific biological opinion for the Project. In fact, FWS made no project-specific jeopardy determination. *Gifford* and *Buckeye Forest* do not address whether FWS can rely *exclusively* on a previously conducted biological opinion. *Gifford* and *Buckeye Forest* also do not address whether FWS can rely on a previous jeopardy determination for a new proposed action.

FWS also cites *Friends of the Wild Swan v. U.S. Forest Serv.*, 875 F. Supp. 2d 1199, 1210 (D. Mont. 2012). The Forest Service and FWS agreed in *Friends of the Wild Swan* that the proposed action would not adversely affect the grizzly bear

and Canada lynx. This agreement eliminated the need for any biological opinion or jeopardy determination. *Friends of the Wild Swan*, 875 F. Supp. 2d at 1210. Here, in contrast, the Forest Service determined that this Project likely *would* adversely affect the grizzly bear. (LW2-00715). The regulations require FWS to prepare a biological opinion that includes a jeopardy determination if the Forest Service determines that a proposed action likely will adversely affect a listed species. § 402.14.

FWS next cites *Swan View Coal. v. Weber*, 2014 WL 4824551 (D. Mont.). FWS determined in *Swan View* that the programmatic biological opinion analyzed fully the effects of the proposed action on the listed species. *Swan View*, *17. The court determined that the plaintiffs had failed to demonstrate any effects of the proposed action that had not been analyzed fully in the programmatic biological opinion. *Swan View*, *18. Plaintiffs allege here that FWS failed to consider the potential impacts of logging activities in the programmatic biological opinion.

FWS finally cites the September 26, 2014 order in *Alliance for the Wild Rockies v. Ashe*, CV-13-92-M-DWM. Both the Forest Service and FWS agreed in *Ashe* that the project impacts could be divided into activities related to road access and activities that did not relate to road access. The Forest Service and FWS agreed that a previous programmatic biological opinion had analyzed fully the impacts to grizzly bears from road access. This agreement allowed FWS to rely entirely on

this previous biological opinion instead of repeating this analysis in a new biological opinion. *Ashe* at 9. The Forest Service and FWS further agreed that all project activities, other than road access, would cause no adverse impacts to grizzly bears. *Ashe* at 9, 14; Doc. 42 at 7-8. FWS had no obligation to conduct a biological opinion for activities that the agencies had agreed would not adversely affect the grizzly bear. *Ashe* at 9.

This Court need not determine whether the Endangered Species Act permits the Forest Service and FWS to limit its analysis in a biological opinion to certain project activities. Unlike in *Ashe*, the Forest Service failed to differentiate between the impacts to grizzly bears that would result from road usage and the other potential impacts to grizzly bears. The Forest Service determined that the Project, as a whole, likely would adversely affect grizzly bears. The analysis conducted in *Ashe* does not persuade this Court that the Endangered Species Act did not require FWS to conduct a biological opinion that analyzed all effects of the Project to grizzly bears.

FWS contends that the 2006 Travel Plan Biological Opinion adequately analyzed the only possible adverse effect to the grizzly bear: road access. FWS argues that the 2006 Travel Plan Biological Opinion fully analyzed the issue of road access. FWS argues, as a result, that the Project can rely on the jeopardy determination made in the 2006 Travel Plan Biological Opinion. The 2006 Travel

Plan Biological Opinion, conducted to evaluate the effects of road access on grizzly bears, evaluates no specific logging proposal, such as this Project.

The regulations do not require FWS merely to evaluate the effects of the action that could *adversely* affect a listed species. Section 402.14(h)(2) requires a biological opinion to include "a detailed discussion of the effects of the action." Similarly, section 402.14(g)(3) and (4) requires FWS to evaluate the cumulative effects of the project. This "cumulative effects" analysis would consider all project affects together, not just the actions that alone would cause adverse effects to a listed species. Section 402.14(h)(1) requires "[a] summary of the information on which the opinion is based." This summary would include an analysis of why road access represents the only possible adverse effect to grizzly bears.

FWS has conducted no written analysis on any effects of the Project other than road access. The Forest Service's biological assessment for the Project identifies other possible effects of the Project for grizzly bears. These possible effects include the use of developed camp sites and food storage issues. (LW2-00726). The biological assessment also discusses whether the Project would affect grizzly bears' food sources and whether the changes in the forest age structure in the Project area would affect the grizzly bear. (LW2-00736). The Forest Service's biological assessment further describes how to mitigate some of these effects. These mitigation efforts include placing a maximum limit of five consecutive years

on major timber sale activities. (LW2-00736 to 737). FWS provides no written analysis of these other effects that the Forest Service anticipates that the Project will cause.

Other courts have considered whether an agency can rely entirely on a programmatic Environmental Impact Statement (EIS) instead of conducting a second-tier, site specific EIS. Plaintiffs present the issue here in the context of a biological opinion. The analysis as to when an agency can rely entirely on a previous document nevertheless proves relevant. The Eighth Circuit determined that "if the environmental effects of timber cutting are considered in the overall EIS, an individual EIS for each timber sale would not be required, absent a material change in circumstances or a departure from the policy covered in the overall EIS." *Minn. Pub. Interest Research Grp. V. Butz*, 498 F.2d 1314, 1323 n.29 (8th Cir. 1974). Similarly, no reason exists "to require a site-specific statement that would merely duplicate the programmatic EIS." *Ventling v. Bergland*, 479 F. Supp. 174, 179 (D.S.D.) aff'd, 615 F.2d 1365 (8th Cir. 1979).

A site-specific biological opinion would not be merely duplicative here. The 2006 Travel Plan Biological Opinion did not evaluate activities associated with logging. A site-specific biological opinion evaluating the Project would consider the effects of logging activities on grizzly bears. A site-specific biological opinion also would make a jeopardy determination for the Project. The reasoning of

*Gifford* seems to allow FWS to tier a site-specific biological opinion back to the 2006 Travel Plan Biological Opinion for the issue of road usage. *Gifford*, 378 F.3d at 1068. FWS could tier the site-specific biological opinion back to the 2006 Travel Plan to the extent that the site-specific biological opinion "would merely duplicate the programmatic" 2006 Travel Plan Biological Opinion. *Ventling*, 479 F. Supp. at 179. The Court remands this matter to the Forest Service to obtain a site-specific biological opinion for the Project that should include an analysis of all logging associated activities. The Forest Service must then decide how to proceed pursuant to 50 C.F.R. § 402.15.

**c. 2007 Lynx Direction Biological Opinion**

The 2007 Lynx Direction Biological Opinion establishes vegetation standards to protect lynx. It also grants "exceptions and exemptions" from the standards for certain types of actions, including the actions in this Project. (*See* LW2-019938, LW2-00734). FWS evaluated the impacts that FWS anticipated will occur as a result of exempting and excepting certain actions from these vegetation standards. The Project will rely on these exemptions. FWS argues that it fully analyzed the type of action at issue in the Project in the 2007 Lynx Direction Biological Opinion.

The 2007 Lynx Direction Biological Opinion clearly states, however, that a second-tier, site-specific biological opinion must be conducted for projects that

rely on the exemptions or exceptions from the vegetation standards. "[S]ite specific consultation (second tier) is required for actions that may affect listed species, including those conducted under the exceptions and exemptions." (LW2-019971). FWS acknowledged in the 2007 Biological Opinion that it was making some assumptions regarding how the exemptions and exceptions would affect lynx. FWS stated that the site-specific consultation would provide FWS "a means to assess the validity of our assumptions." (LW2-019971). FWS has offered no explanation for why it failed to comply with the terms of its own biological opinion.

FWS determined that its programmatic, 2007 Lynx Direction Biological Opinion would not be sufficient for future projects that relied upon the exemptions and exceptions. FWS has not revised the 2007 Lynx Direction Biological Opinion to remove the requirement that a second-tier, site-specific biological opinion be conducted for any project that relies upon the exceptions and exemptions to the vegetation standards. FWS must comply with the framework that it previously set forth and conduct a site-specific biological opinion. This site-specific biological opinion will allow FWS to assess the validity of the assumptions FWS made in the 2007 Lynx Direction Biological Opinion. The Court remands this matter to the Forest Service to obtain a site-specific biological opinion for the Project. The Forest Service must then decide how to proceed pursuant to 50 C.F.R. § 402.15.

**2. Endangered Species Act: Failure to Comply with 2006 Travel Plan Incidental Take Permit**

Plaintiffs contend that even to the extent that the Project could rely on the 2006 Travel Plan Biological Opinion for the issue of road access, the Forest Service has failed to comply with the 2006 Travel Plan's Incidental Take Permit. The 2006 Travel Plan Incidental Take Permit describes road density thresholds, as well as secure core areas without roads. Grizzly bears avoid areas with high road density. Efforts to maintain or reduce road density would benefit grizzly bears.

The 2006 Travel Plan Incidental Take Permit adopts percentages for acceptable road density. It allows 25.1% Open Motorized Access Road Density, 19% Total Motorized Access Route Density, and requires 62.5% Core Area. (LW2-019890). The parties agree that the Project fails to meet these numerical thresholds. Plaintiffs argue that the Forest Service's failure to comply with these numerical thresholds violates the terms of the Incidental Take Permit.

The Forest Service explains, however, that these numbers represented the 1998 baseline of road density and core area. The Forest Service adopted new spatial modeling algorithms after the Forest Service had derived those numbers. This new modeling technique allowed the Forest Service to determine more accurately the road density that existed in 1998. The Forest Service updated the numbers for the 1998 baseline. The Forest Service compared the Project with the updated 1998 baseline numbers. The Forest Service concluded that the Project

14

would not increase road density or decrease core area compared to the updated 1998 baseline figures.

The Court agrees that the 2006 Travel Plan Incidental Take Permit adopted these numerical thresholds as a reflection of the 1998 baseline. The Incidental Take Permit provides that the "standard for access management in the recovery zone is to maintain secure habitat within subunits at or above 1998 levels." (LW2-019905). The 2006 Travel Plan chose 1998 as the baseline year because "this was the access level at which the grizzly bear population was considered recovered." (LW2-019853).

The numerical thresholds adopted in the Incidental Take Permit merely represent the best estimation of the 1998 baseline. The numerical thresholds do not represent a scientific determination that grizzly bear protection requires those precise numbers. The Forest Service has used new modeling techniques to update the road density figures to better reflect the actual 1998 baseline. The Project will not increase road density or decrease core areas compared to the 1998 baseline. The Forest Service has complied with the terms of the 2006 Travel Plan Incidental Take Permit.

## 3. Endangered Species Act: Biological Assessment of Wolverine

Plaintiffs argue that the Forest Service violated the Endangered Species Act by failing to conduct a biological assessment for the North American wolverine at

a time when FWS had proposed the species for listing under the Endangered Species Act as "threatened." The Forest Service responds that FWS's withdrawal of the proposal to list the wolverine has rendered moot this claim. Plaintiffs contend that this question remains justiciable under the "capable of repetition yet evading review" exception to the mootness doctrine.

**a. Mootness**

A court may decide an otherwise moot issue if the issue remains "capable of repetition yet evading review." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1018 (9th Cir. 2012). This exception to the mootness doctrine applies when "the duration of the challenged action is too short to allow full litigation before it ceases or expires," and when a reasonable expectation exists "that the plaintiffs will be subjected to the challenged action again." *Karuk Tribe*, 681 F.3d at 1018.

Eighteen months constitutes the duration of the challenged action. A species will be proposed for listing only for twelve months, with the possibility of a six month extension. 16 U.S.C. § 1533(b)(6)(A), (B). The species either will be withdrawn, as occurred here, or will be listed within this eighteen month period. Eighteen months fails to provide sufficient time for this question to be litigated fully. *Karuk Tribe*, 681 F.3d at 1018 (noting that actions lasting only one or two years evade review). Plaintiffs have satisfied the first prong to this exception to the mootness doctrine.

Plaintiffs routinely have demonstrated their dedication to challenge Forest Service projects that Plaintiffs believe violate the Endangered Species Act. Plaintiffs have filed numerous lawsuits in the District of Montana that challenge Forest Service projects. Plaintiffs also challenged two different Forest Service projects for failing to revise the biological assessment to include the wolverine during the short time period in which FWS proposed the wolverine for listing. *See Swan View Coal.*, 2014 WL 4824551, and *Alliance for the Wild Rockies v. Krueger*, CV-14-12-BMM. These past actions create a reasonable expectation that Plaintiffs would challenge in the future any project that they believe violates the Endangered Species Act for a proposed species. Plaintiffs have met the second prong of this exception to the mootness doctrine.

**b. Biological Assessment for the Wolverine**

The regulations for the Endangered Species Act require a biological assessment that evaluates "the potential effects of the action on listed and proposed species." 50 C.F.R. 402.12(a). The federal agency does not need to conduct a biological assessment if only proposed species are present in the action area. § 402.12(d)(1). If the proposed listing becomes final, however, the federal agency must conduct a biological assessment. § 402.12(d)(1). The federal agency must confer with FWS regarding a proposed species only if the project likely would

"jeopardize the continued existence of the proposed species." § 402.10; *see also* § 402.12(d)(1).

The regulations do not appear to contemplate the factual scenario that occurred in this case. The Forest Service conducted a biological assessment for the listed species in the project area: grizzly bear and Canada lynx. FWS proposed listing the wolverine after the Forest Service had completed its biological assessment. Nothing in the regulations appears to require the Forest Service to revise its biological assessment to include a newly proposed species. No biological assessment would be required if only a proposed species had been present in the action area. § 402.12(d)(1). This framework suggests an interpretation of the regulations that would not require the Forest Service to revise its biological assessment for a newly proposed species.

Further, the Forest Service evaluated the wolverine in its Environmental Impact Statement. The Forest Service considered the wolverine to be a sensitive species. FWS labeled the wolverine a "candidate" for listing. The Forest Service determined that the Project likely would not result in wolverine mortality after having analyzed the Project's potential impacts. (LW2-00503). The Forest Service also prepared a Supplemental Information Report after FWS had proposed the wolverine for listing. The Forest Service concluded that the Project would not jeopardize the continued existence of the wolverine. (LW2-024332).

The Forest Service appears to have fulfilled its obligations under the regulations. The Forest Service determined that the Project likely would not jeopardize the wolverine. Section 402.10 required no conference between the Forest Service and FWS. The Forest Service conducted a biological assessment that included all of the species that had been listed and proposed at that time, as required by section 402.12.  FWS ultimately decided not to list the wolverine. Section 402.12(d)(1) did not require the Forest Service to include the wolverine in a biological assessment under these circumstances. The regulations do not appear to require the Forest Service to revise its completed biological assessment for a newly proposed species. § 402.12.

**4. Forest Plan for the Gallatin National Forest**

**a. Amendment 19 to the Forest Plan**

Plaintiffs argue that the Forest Service violated the prohibition in Amendment 19 of the Forest Plan against increasing road density or decreasing core areas. The Project allows for the temporary construction of six miles of road. The Forest Service plans to offset these temporary roads by permanently barricading six miles of existing roads.

Plaintiffs contend that the Forest Service's efforts to barricade six miles of existing roads fails to offset the six miles of new roads. Plaintiffs argue that barricaded roads still count as "restricted roads." Defining these barricaded roads

as "restricted roads" would include these barricaded roads in the Total Motorized Access Route Density.  Defendants respond that barricaded roads do not count as "restricted roads."

### i. Does the Project Violate Amendment 19?

This claim forces the Court to parse definitions set forth in Forest Service regulations. Courts typically defer to an agency when it interprets its own regulations. *Native Ecosystems Council v. U.S. Forest Serv., an agency of U.S. Dep't of Agric.*, 418 F.3d 953, 960 (9th Cir. 2005). Amendment 19 defines a road as "reasonably and prudently drivable with a conventional passenger car." Roads either can be "open" or "restricted." An open road has no restrictions on motorized use. A restricted road restricts motorized use "seasonally or yearlong." A restricted road "requires physical obstruction."  (LW2-001545).

Amendment 19 defines a "trail" as "all created or evolved access routes that do not quality [sic] as a 'road.'" A "restricted motorized trail" is a "trail on which motorized use is restricted seasonally or yearlong." Total Motorized Access Route Density includes "all open and restricted roads and motorized trails." (LW2-001545).

Plaintiffs argue that a barricaded road qualifies as a restricted road. It would be reasonable to drive on it in a passenger car absent the barricade. A physical obstruction, in the form of a barrier, will restrict motorized use year-round. A

restricted road would count as part of the Total Motorized Access Route Density. The Forest Service's plan simply to restrict certain roads to offset the creation of new roads would therefore result in an increase in road density. This increase in road density would violate Amendment 19.

The Forest Service argues that the permanent barricade will exclude the six miles from motorized use. The Forest Service argues that these permanently barricaded routes fall outside the definitions in Amendment 19. Amendment 19 fails to include in its Total Motorized Access Route Density calculation an access route that never again will receive motorized use. Total Motorized Access Route Density includes open and restricted roads and motorized trails. The definitions of "restricted road" and "restricted trail" allows for motorized used by administrative personnel. Use by administrative personnel would not be possible on a barricaded road.

This Court grants substantial deference to agencies when they interpret their own regulations, including Forest Plans. *Native Ecosystems Council*, 418 F.3d at 960. This Court defers to the Forest Service's determination that a permanently barricaded route falls outside the definitions in Amendment 19. The Forest Service has not appeared to have increased the Total Motorized Access Route Density. Plaintiffs do not argue that the Forest Service has reduced core area. The Forest Service has not violated Amendment 19.

### ii. Failure to Adopt Access Standards

Plaintiffs argue that the Forest Service has failed to comply with the Forest Plan for the Gallatin National Forest by failing to adopt "access standards." Amendment 19 to the Gallatin Forest Plan provides: "Standard A.1.a. Adopt Yellowstone access standards when they become available." (LW2-001544). These access standards relate to Open Motorized Access Route Density, Total Motorized Access Route Density, and Secure Core. Plaintiffs argue that the Forest Service has failed to amend the Forest Plan to implement these available access standards. Plaintiffs suggest that the Yellowstone Grizzly Bear Recovery Zone represents the only zone required to have these access amendments that has not yet adopted them.

Plaintiffs first argue that this failure violates the Endangered Species Act. The Forest Service appears to have relied on access standards in this Project. The Forest Service has adopted Open Motorized Access Route Density, Total Motorized Access Route Density, and secure core standards as part of the 2006 Travel Plan. The Forest Service appears to have considered these access standards to the extent that the Endangered Species Act requires.

The Forest Service admittedly has not yet amended the Forest Plan to adopt these access standards. The Forest Service contends that these access standards are not yet available. FWS noted in the 2006 Travel Plan Biological Opinion that the Interagency Conservation Strategy Team created the Conservation Strategy for

Grizzly Bear in the Yellowstone Ecosystem. FWS stated in the 2006 Travel Plan Biological Opinion that "[t]he Conservation Strategy provides [the] standards" required by Amendment 19. (LW2-019852). The Forest Service's contention regarding unavailability rings hollow in light of FWS's contrary statements in its 2006 Travel Plan Biological Opinion.

FWS further noted the Forest Service's intention to amend the Forest Plan to include the Conservation Strategy. (LW2-019853). The Forest Service apparently intended to make this amendment after the grizzly bear had been delisted as an endangered species. The Ninth Circuit rejected FWS's attempt to remove the grizzly bear from threatened species list. *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1030 (9th Cir. 2011).

The Forest Service adopted Amendment 19 in 1996. Eighteen years have passed. The Forest Service has yet to adopt access amendments for the Gallatin National Forest. The Court recognizes that the Forest Service had intended to adopt access amendments after the grizzly bear had been delisted. The Court declines to find that the Forest Service has violated the Forest Plan by failing to adopt access standards. The Court emphasizes, however, that the Forest Service cannot delay indefinitely the adoption of these currently available access standards.

**b. Indicator Species**

Plaintiffs contend that the Forest Service has failed to monitor population trends for old growth indicator species, and, consequently, has failed to ensure the viability of these species. The Forest Plan for the Gallatin National Forest requires the Forest Service to "[d]etermine population trends of indicator species and relationships to habitat changes." (LW2-001287). The Forest Service selected goshawk and pine martens as management indicator species for management activities that affect old growth forests. (LW2-001196).

The Environmental Impact Statement for the Project suggests that the Forest Service cannot determine the population trends for the goshawk. Plaintiffs claim that the Forest Service has failed to gather data on the goshawk's population trends in violation of the Forest Plan. Plaintiffs further claim that the Forest Service possesses a duty to maintain a viable population of the goshawk.

The Forest Service conducted a Management Indicator Species Assessment that reviewed Northern goshawk and American pine marten in 2011. (LW2-013641). The Forest Service referenced goshawk assessments conducted in 2005, 2007, and 2009. (LW2-013656 to 013657). The 2011 assessment sampled ten Potential Sampling Units. The 2011 assessment detected goshawks in two of the units and an active nest in a third unit. The Forest Service reported that goshawk populations "appear to be stable and cycling at low numbers." (LW2-013658).

The Forest Service noted that the Montana Department of Fish, Wildlife, and Parks annually conducts snow track surveys to monitory population trends of pine marten. Between 1997 and 2009, detections of pine marten ranged from 15.8 per 100 miles up to 156.5 per 100 miles. Pine marten trapped in Montana must be registered. The statewide harvest has remained stable over the last ten years. The Forest Service concluded that there exists a "relatively stable or slightly declining population" of pine marten on a statewide basis. (LW2-013661).

The Forest Service has conducted sufficient research on the population trends of the goshawk and the pine marten. *See Alliance for the Wild Rockies v. Krueger*, 950 F. Supp. 2d 1196, 1211-12 (D. Mont. 2013) (concluding that this 2011 assessment met the Forest Service's obligation to monitor population trends for goshawk). Plaintiffs have failed to point to any Forest Service duty to maintain a viable population of goshawk or pine marten. Plaintiffs likewise have failed to cite a specific provision of the Forest Plan for the Gallatin National Forest that incorporates a standard that goshawk and pine marten populations remain viable. The Forest Service has not violated the Forest Plan for the Gallatin National Forest.

Plaintiffs have presented several other issues in their motion for summary judgment. The Court finds that these arguments lack merit.

IT IS ORDERED that the motions for summary judgment (Doc. 21 and Doc. 38) are GRANTED IN PART and DENIED IN PART. Summary judgment is granted in favor of Plaintiffs on their claim that FWS must conduct a site-specific biological opinion for the Project. Summary Judgment is granted in favor of Defendants on all of Plaintiffs' other claims.

IT IS FURTHER ORDERED that the defendants are enjoined from implementing the Lonesome Wood II Project while the proceedings required on remand are pending.

DATED this 5th day of December, 2014.


Brian Morris
United States District Court Judge