JOHN C. CRUDEN,
Assistant Attorney General
SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief
TRAVIS ANNATOYN, Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-5243 (tel)
(202) 305-0275 (fax)

Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES,<br><br>Plaintiffs,<br><br>v.<br><br>FAYE KRUEGER, et al.<br><br>Defendants. | CASE NO. 9:13-cv-64-BMM<br><br>BRIEF IN SUPPORT OF MOTION TO DISSOLVE INJUNCTION |

# INTRODUCTION

In its summary judgment opinion and order of December 5, 2014, the Court ruled in favor of Defendants on all but two claims under the Endangered Species Act ("ESA").  ECF No. 70 ("Order").  In particular, the Court determined that the circumstances of this case warrant site-specific "Biological Opinions" addressing impacts to the grizzly bear and Canada lynx from the Lonesome Wood Vegetation Management Project ("Project"), an effort by the United States Forest Service ("USFS") to reduce wildfire risk near Yellowstone National Park and Hegben Lake.  Pending completion of these site-specific Biological Opinions, the Court enjoined all Project activities.

The United States Fish and Wildlife Service ("FWS") and USFS have now complied with the Court's order, remedying the procedural violations identified by the Court.  Specifically, FWS has prepared site-specific Biological Opinions which affirm its original conclusion that Project activities will not jeopardize the grizzly bear or lynx.  These conclusions – and USFS' subsequent decision to proceed with the Project as planned – constitute full compliance with the Court's remand order.  Because there is no reason to enjoin the Project beyond that order, the Court should dissolve its injunction and permit USFS to proceed with fire prevention activities in the Gallatin National Forest ("Forest").

//

# BACKGROUND

## I. LEGAL BACKGROUND

### A. The Endangered Species Act

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). In relevant part, Section 7(a)(2) of the ESA prohibits federal agencies from taking any action that is likely to "jeopardize the continued existence of any endangered species or threatened species" or destroy or adversely modify the species' critical habitat. 16 U.S.C. § 1536(a)(2). To this end, the ESA requires that federal "action agencies" (here, USFS) consult with FWS whenever the agency's action "may affect" a species listed as threatened or endangered. 50 C.F.R. § 402.14(a).[1]

If a proposed action "may affect" a listed species, the action agency must engage in "informal" or "formal" consultation, as appropriate. Informal consultation is "an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency . . . designed to assist the [action agency] in determining whether formal consultation . . . is required." 50 C.F.R. §

---

[1] The ESA is administered by the Secretary of the Interior and the Secretary of Commerce, 16 U.S.C. § 1532(15), with the Secretary of the Interior generally responsible for terrestrial species. The Secretary of the Interior has delegated her responsibilities to FWS.

402.13(a).  "If during informal consultation it is determined by the [action agency], with the written concurrence of [FWS], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary."  Id.  If, however, the action agency or FWS determines that the action is "likely to adversely affect" listed species or designated critical habitat, the agencies must engage in formal consultation.  50 C.F.R. §§ 402.13(a), 402.14(a)–(b).  During formal consultation, FWS produces a "Biological Opinion" of the proposed action's impact on listed species and critical habitat.  Id. at §§ 402.14(g)(4), (h)(3); see also 16 U.S.C. § 1536(b)(4).

## B. The National Environmental Policy Act

The National Environmental Policy Act ("NEPA") establishes a consistent process through which federal agencies consider the environmental consequences of their actions.  See 42 U.S.C. §§ 4321-4370.  NEPA requires federal agencies to prepare a detailed "environmental impact statement" ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  An EIS must include a "detailed [written] statement" concerning "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided;" it should inform the decision-maker and the public of reasonable alternatives which would minimize the adverse impacts or enhance the quality of the environment.  Id.; see also 40 C.F.R. §§ 1502.1,

1508.11.  NEPA ensures informed public decision-making, but NEPA does not require an agency to arrive at a particular decision.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989); see also Lands Council v. McNair, 537 F.3d 981, 1000 (9th Cir. 2008) (en banc) (NEPA "does not impose any substantive requirements on federal agencies – it exists to ensure a process.") (quotation marks and citation omitted).

### C. The National Forest Management Act

Administration of the National Forest System is chiefly governed by the National Forest Management Act ("NFMA").  16 U.S.C. §§ 1600-1614.  Forest planning under NFMA is carried out in two stages.  Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 728-32 (1998).  The first level is embodied by a "forest plan," a broad, programmatic document.  Id. at 729-30; 16 U.S.C. § 1604.  At the second level, USFS undertakes site-specific actions to achieve the plan's goals.  Ohio Forestry, 523 U.S. at 729-30; 16 U.S.C. § 1604(i).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A.  Project Design And Analysis

Between 1999 and 2008, the Gallatin National Forest witnessed a substantial increase in the number of wildland fires escaping initial attack.  The fires exhibited increased size and intensity, and were less likely to be contained or controlled.  LW2:B1:127. These trends – which are expected to continue – are likely due to a

drier, more unpredictable climate, and an increase in dead trees from bark beetle populations.  Id.

Several regulations and standards direct the Forest to protect the "Wildland Urban Interface," or areas where development and vegetation intermingle.  Id. at 142.  In 2005, an interdisciplinary team issued the Hebgen Lake Watershed Risk Assessment, which identified the area west of Hebgen Lake as a Wildland Urban Interface at risk of wildfire due to poor access and heavy wildland fuel loadings.  Id. at 116.  The Project seeks to reduce this risk in an area roughly twelve miles from West Yellowstone, the gateway to Yellowstone National Park for roughly two million of the Park's three million annual visitors.  Id. at 125.

Project design and planning began in 2007.  In 2009, however, this Court invalidated FWS' decision to remove ESA protections for grizzly bears residing in the Project area.   See Greater Yellowstone Coal. v. Servheen, 665 F.3d 1015 (9th Cir. 2011).  Afterwards, the Forest chose to revisit the design of the Project. LW2:B1:127.  On June 9, 2010, the Forest announced its intent to issue a new environmental impact statement for the Project, seeking public comment through 2011.  LW2:A1:67.  The Forest issued a final environmental impact statement in October, 2012, LW2:B1:113, and approved the Project on December 11, 2012. LW2:A1:79

By treating accumulated and dangerous fuel loads, the final Project will increase firefighter and public safety, reduce wildland fire risk to public and private improvements, and modify fire behavior in and near the Hebgen Basin Watershed.  LW2:B1:125-26, 32-35.  The Project includes approximately 1,750 acres of forest thinning with mechanized ground based methods, 825 acres of small tree thinning, and 325 acres of slashing or prescribed burning.  LW2:A1:05.  Upon completion, all temporary roads constructed during the Project's lifespan (roughly six miles) will be fully drained, ripped, slashed, and seeded, *i.e.*, permanently closed.  Id. at 18.

Because the Project is likely to adversely affect both the grizzly bear and the Canada lynx – each listed as "threatened" under the ESA – USFS and FWS are obligated to undertake formal consultation as described in ESA Section 7(a)(2) and its implementing regulations.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12.  In seeking to comply with these requirements, FWS relied on informal, site-specific consultation to conclude that all adverse effects to ESA-listed species were analyzed and governed by two prior, programmatic Biological Opinions: the Biological Opinion for the 2007 Gallatin National Forest Travel Management Plan ("Travel Plan") and the Biological Opinion for the Northern Rockies Lynx Amendment ("Lynx Amendment").  In a 2012 "Affirmation Letter," FWS determined that no site-specific Biological Opinions were necessary under ESA

Section 7 because the Biological Opinions for the Travel Plan and Lynx Amendment governed each of the Project's adverse effects to the grizzly bear and Canada Lynx, respectively.  LW2:D201.

### B. The Court's Decision And Remand Order

Plaintiffs' amended complaint, filed on July 19, 2013, asserted six claims for relief stemming from the Project's environmental review and approval: (1) violations of the ESA, NFMA, and NEPA relating to the grizzly bear; (2) violations of the ESA, NFMA, and NEPA relating to the wolverine; (3) violations of the ESA, NFMA, and NEPA relating to the Canada lynx; (4) violations of NFMA and NEPA relating to big game (i.e., elk and moose); (5) violations of NEPA and NFMA relating to old growth species (such as the northern goshawk); and (6) a violation of the Roadless Rule.  Following summary judgment briefing, an associated motion hearing, and two rounds of supplemental briefing, the Court granted summary judgment to Defendants on all but two of Plaintiffs' arguments.

The Court determined, however, that Defendants had not adequately consulted on Project impacts to the grizzly bear and lynx.  The Court held that FWS should have prepared a site-specific Biological Opinion for the grizzly bear, noting that such an opinion "would consider the effects of logging activities on grizzly bears" and "make a jeopardy determination for the Project," but "could tier . . . back to the . . . Travel Plan to the extent that the site-specific biological opinion

'would merely duplicate the programmatic' . . .  Biological Opinion."  Order at 11-12. (citing <u>Ventling v. Bergland</u>, 479 F. Supp. 174, 179 (D.S.D. 1979)).  The Court also required FWS to prepare a site-specific Biological Opinion for the Canada lynx, to allow the agency to consider the Project-level effects of Lynx Amendment standards.   Order at 12-13.   The Court's order further required the Forest to "decide how to proceed" following preparation of both Opinions, <u>id.</u> at 12, 13, and enjoined Project activities pending the "proceedings required on remand."  <u>Id.</u> at 26.

## <u>STANDARD OF REVIEW</u>

The normal remedy for Administrative Procedure Act violations is remand to the agency for a new determination in accord with the Court's holdings.[2]  <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985); <u>see also</u> <u>Fed. Power Comm'n v. Idaho Power Co.</u>, 344 U.S. 17, 20 (1952) ("[T]he guiding principle . . . is that the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration."); <u>accord</u> <u>Grimm v. Brown</u>, 449 F.2d 654, 657 (9th Cir. 1971) ("It is an established principle of Administrative Law that in reviewing an administrative order, the court should not, either for the purpose of affirming or reversing the agency action, make a

---

[2] While Plaintiffs' ESA claims against USFS were brought pursuant to that statute's citizen suit provision, the Court evaluates all ESA challenges under the APA's standard of review. <u>Ser7heen</u>, 665 at 1023

determination of policy or judgment which the agency alone is authorized to make and which it has not done.") (citiations omitted).

Courts have "continuing jurisdiction to terminate, dissolve, vacate, or modify an injunction or an interlocutory order in the event that changed circumstances require it." Univ. of Haw. Prof'l Assembly v. Cayetano, 125 F. Supp. 2d 1237, 1240 (D. Haw. 2000) (citing United States v. Oregon, 769 F.2d 1410, 1416 (9th Cir. 1985), and In re Detroit Auto Dealers Ass'n, 84 F.3d 787, 789 (6th Cir. 1996)).  In particular, Federal Rule of Civil Procedure 60(b) allows courts to "relieve a party or its legal representative from a final judgment, order, or proceeding [if]: . . . (5) the judgment has been satisfied, released, or discharged."

A party seeking dissolution of an injunction must demonstrate that there has been a significant change in facts or law.  Alliance for Wild Rockies v. Kruger, 15 F. Supp. 3d 1052, 1054 (D. Mont. 2014) (citing Sharp v. Weston, 233 F.3d 1166, 1170 (9th Cir. 2000)). Moon v. GMAC Mortg. Corp., No. C08-969Z, 2008 WL 4741492, at *2 (W.D. Wash. Oct. 24, 2008) ("A significant change is one that pertains to the underlying reasons for the injunction.") (citation omitted).  It is an abuse of discretion if, after the moving party carries this burden, the court "refuses to modify an injunction . . .  in light of such changes." Horne v. Flores, 557 U.S. 433, 447 (2009) (quoting Agostini v. Felton, 521 U.S. 203, 215 (1997)).

## ARGUMENT

The Court should dissolve its injunction because the agencies have remedied the procedural violations identified in the Court's summary judgment order. Consummation of the Court's remand is a "significant change" that directly implicates the rationale for an injunction, and therefore warrants the injunction's dissolution.  See GMAC Mortg., 2008 WL 4741492, at *2 (citing United States v. Swift & Co., 189 F. Supp. 885, 905 (N.D. Ill. 1960)); see also Horne v. Flores, 557 U.S. at 447.

Specifically, FWS has prepared site-specific Biological Opinions addressing the Project's impacts on both grizzly bears and Canada lynx.  See Attachment 1. The site-specific Biological Opinion for the grizzly bear explicitly addresses Project effects from logging, and determines that the Project will not jeopardize the species.  Id. at 5-7.  Likewise the site-specific Biological Opinion for the lynx explicitly evaluates Project effects under Lynx Amendment parameters and concludes that the Project will not jeopardize the lynx.  Id. at 10, 12-15.  Following issuance of these documents by FWS, the Forest has concluded that the Project may proceed as designed.  See Attachment 2.  These actions satisfy FWS' obligation to "conduct a site-specific biological opinion for the Project," and therefore complete all "proceedings required on remand."  Order at 26.  Because the Court enjoined Project activities only while the remand was being completed,

Defendants' site-specific environmental analysis warrants dissolution of the

Court's injunction.  Alliance for Wild Rockies, 15 F. Supp. 3d at 1057; Lands

Council v. Krueger, No. CV 09-164-N-EJL-REB, 2014 WL 6629591, at *5 (D.

Idaho Nov. 21, 2014).

## **CONCLUSION**

For the reasons set forth above, the Court should dissolve the injunction set

forth in its summary judgment opinion.


Respectfully submitted this 1st day of July, 2015.



JOHN C. CRUDEN,
Assistant Attorney General
SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief

/s/ *Travis J. Annatoyn*
TRAVIS J. ANNATOYN, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Benjamin Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-5243
Facsimile: (202) 305-0275

*Attorneys for Federal Defendants*