Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES<br><br>Plaintiffs,<br><br>vs.<br><br>FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATE FISH & WILDLIFE SERVICE, an agency of the U.S. Department of the Interior,<br><br>Defendants. | CV-13-64-BMM<br><br><br>PLAINTIFFS' RESPONSE OPPOSING DEFENDANTS' MOTION TO DISSOLVE INJUNCTION |

# TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  RESPONSE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Attachment 1 does not comply with express instruction from this Court.. 2

    B.  FWS has not prepared site-specific biological opinions for the Project.. . 6

        1.  Description of the Proposed Action. . . . . . . . . . . . . . . . . . . . . . . 7

        2.  Status of the species. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3.  Environmental Baseline. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        4.  Effects of the Action.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        5.  Cumulative effects. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

TABLE OF AUTHORITIES

CASES

*Alliance for the Wild Rockies v. USFS,* 2008 WL 8985475 (D. Mont. 2008). . . . . . 3

*Ctr. for Biological Diversity v. Salazar,* 804 F. Supp.2d 987 (D. Ariz. 2011). . . . 16

*Greenpeace v. National Marine Fisheries Service,* 80 F. Supp. 2d 1137 (W.D. Wash. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*National Wildlife Federation v. National Marine Fisheries Serv.,* 524 F.3d 917 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Organized Village of Kake v. U.S. Department of Agric., --- F.3d ----,* 2015 WL 4547088 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Pacific Coast Federation of Fishermen's Ass'ns v. United States Bureau of Reclamation,* 426 F.3d 1082 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . 16

*South Yuba River Citizens League v. National Marine Fisheries Serv.,* 723 F.Supp.2d 1247 (E.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

REGULATIONS

50 C.F.R. §402.14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

INDEX OF EXHIBITS

Exhibit A:  Rock Creek Mine Biological Opinion for Grizzly Bears

Exhibit B:  ESA Section 7 Handbook

# I. INTRODUCTION

On December 5, 2014, this Court issued an injunction against implementation of a logging and road-building project on the Gallatin National Forest called the Lonesome Wood 2 Project. The Project allows hundreds of acres of commercial logging – including hundreds of acres of old growth forest logging – and several miles of road-building in habitat for species listed under the Endangered Species Act (ESA). The Court issued the injunction because the U.S. Forest Service and U.S. Fish & Wildlife Service (FWS) found that the Project was likely to adversely affect the threatened grizzly bear and threatened lynx, but FWS had failed to prepare site-specific biological opinions for these species as required by the ESA.

On July 1, 2015, the agencies filed a motion to dissolve the Court's injunction so that logging and road-building may proceed. The agencies argue that they have complied with the Court's Order and prepared site-specific biological opinions for grizzly bears and lynx. For the reasons discussed below, Plaintiffs disagree that the agencies have complied with the Court's Order. Therefore, for this reason and all other reasons set forth by Plaintiffs in prior briefing, Plaintiffs respectfully request that the Court deny the agencies' motion.

# II. RESPONSE

In their brief in support of their motion to dissolve the injunction, the agencies present essentially one paragraph of argument:

Specifically, FWS has prepared site-specific Biological Opinions addressing the Project's impacts on both grizzly bears and Canada lynx. See Attachment 1. The site-specific Biological Opinion for the grizzly bear explicitly addresses Project effects from logging, and determines that the Project will not jeopardize the species. Id. at 5-7. Likewise the site-specific Biological Opinion for the lynx explicitly evaluates Project effects under Lynx Amendment parameters and concludes that the Project will not jeopardize the lynx. Id. at 10, 12-15. Following issuance of these documents by FWS, the Forest has concluded that the Project may proceed as designed. See Attachment 2. These actions satisfy FWS' obligation to "conduct a site-specific biological opinion for the Project," and therefore complete all "proceedings required on remand." Order at 26. Because the Court enjoined Project activities only while the remand was being completed, Defendants' site-specific environmental analysis warrants dissolution of the Court's injunction.

Agencies' Brief at 10-11. Thus, the agencies' argument is essentially that it completed biological opinions and that the Court should therefore dissolve the injunction. However, a careful review of the agencies' Attachment 1 demonstrates that the agencies have not yet complied with this Court's Order. Therefore, the agencies' motion must be denied.

**A. Attachment 1 does not comply with express instruction from this Court.**

Relying on well-established law, this Court's Order held that the ESA requires a detailed discussion of all effects, not just adverse effects, in a biological opinion. *Native Ecosystems Council v. Krueger*, 63 F.Supp.3d 1246, 1252-53 (D. Mont. 2014)(citations omitted). Additionally, a biological opinion must contain a discussion of cumulative effects. *Id.* (citation omitted). A biological opinion must

also include a summary of the information upon which it is based, including in this case an explanation "why road access represents the only possible adverse effect to grizzly bears." *Id.* This Court remanded to FWS for an "analysis of all logging associated activities" in the Project biological opinion, including an analysis of mitigation measures such as the five year limit on duration for major logging activities. *Id.*

On remand, FWS has failed to comply with the Court's Order. As set forth in detail below in Section B, the Project analysis for the grizzly bear does not contain the detailed discussion of effects or a discussion of all cumulative effects. Moreover, as also set forth in more detail in Section B below, the analysis does not contain a summary of the information upon which it is based, because it does not provide basic information on (a) the description of the proposed action including any conservation measures (such as the five year duration limit noted by the Court); (b) species status, including explaining how different activities affect grizzly bears according the scientific research; and (c) environmental baseline, including how different factors have affected grizzly bears in the past. Notably, the analysis does not address – with supporting references – this Court's express question regarding "why road access represents the only possible adverse effect to grizzly bears."[1]

_____

[1] The agencies have determined in the past that displacement from logging operations alone may adversely affect grizzly bears, regardless of road access. *See e.g. Alliance for the Wild Rockies v. USFS*, 2008 WL 8985475 (D. Mont. 2008)

*Krueger*, 63 F.Supp.3d at 1252-53.

The Forest Service concedes in the Project EIS that the Project "would involve temporary access route construction within occupied grizzly bear habitat, and may therefore increase the potential for displacement of bears from important habitat and increase risk of grizzly bear mortality." LW2-00147. In its analysis, FWS does not disclose or analyze displacement and mortality as potential direct or indirect effects on grizzly bears from the construction of six miles of temporary roads.

The Forest Service also concedes in the EIS that "[m]echanical thinning and increased human presence associated with fuels treatments also have the potential to displace bears." LW2-00147. Likewise, the EIS states:

> Noise and human presence associated with proposed fuel reduction treatments could produce disturbance factors that could displace grizzly bears from the project area, or could alter natural behavior patterns of bears in the area.

LW2-00228. In its analysis, FWS does not disclose displacement out of the Project area or alteration of natural behavior patterns as potential direct or indirect effects on grizzly bears from noisy mechanized logging operations. In fact, FWS does not

_____

(noting that other FWS biological opinions had "determined helicopter logging in core would adversely affect grizzly bears by temporarily displacing the bears from core habitat during helicopter operations" and finding that agencies' conclusion that challenged logging project was "not likely to adversely affect" grizzly bears was arbitrary and capricious).

even acknowledge that the act of logging itself will have any direct or indirect effects on grizzly bears.

By failing to address displacement, increased mortality risk, and alteration of natural behavior as direct or indirect effects of construction of temporary roads and implementation of mechanized logging operations, FWS has failed to comply with this Court's Order to conduct an "analysis of all logging associated activities. . . ." *Krueger*, 63 F.Supp.3d at 1252-53. As set forth in more detail below, FWS has also failed to comply with the Court's Order to prepare a biological opinion because the agency did not included the required summary of the proposed action, species status, environmental baseline, detailed analysis of effects, and cumulative effects analysis.

Regarding the lynx analysis, this Court ordered FWS to conduct a site-specific biological opinion for lynx, including an assessment of "the validity of the assumptions FWS made in the 2007 Lynx Direction Biological Opinion." *Id.* at 1254. FWS has failed to conduct an assessment of the validity of its assumptions by any recognizable means, such as by disclosing projected lynx population status and occupancy eight years ago and comparing to actual lynx population status and occupancy now. FWS also fails to disclose whether any new scientific research has been published that either proves or disproves assumptions made by the agency eight years ago in the Lynx Amendment Biological Opinion. In short, the agency

has failed to address the key issue raised by the Court, and instead simply presumes that its eight-year-old assumptions are still valid.

For these reasons, and the reasons set forth in more detail below, FWS has failed to comply with the Court's Order to conduct site-specific biological opinions for the Project.

## B.  FWS has not prepared site-specific biological opinions for the Project.

The analyses provided by FWS consist of an eight page analysis for the grizzly bear and a seven page analysis for the lynx.  Doc. 92-1.  The analyses are cursory and conclusory and fail to contain basic elements of a biological opinion. Plaintiffs respectfully request that the Court reject this attempt by FWS to skirt its legal obligations to conduct a detailed analysis of all direct, indirect, and cumulative effects of this Project.  *See* 50 C.F.R. §402.14.

By means of comparison, Plaintiffs attach a biological opinion for grizzly bears for a different site-specific National Forest project that is also likely to adversely grizzly bears.  Exhibit A:  Rock Creek Mine Biological Opinion for Grizzly Bears.  This biological opinion on the impacts of a site-specific project on grizzly bears on a National Forest is 129 pages excluding appendices.  This biological opinion comports with the ESA Section 7 Handbook description of the required elements for a biological opinion.  Exhibit B:  ESA Section 7 Handbook at 4-15 - 4-45.

As set forth below, the Court should decline to dissolve the injunction because FWS has not yet prepared site-specific biological opinions for the Project.

## 1. Description of the Proposed Action

The description of the proposed action in a biological opinion must include "enough information for the reader to understand and evaluate the action under consideration in the biological opinion." ESA Section 7 Handbook 4-15. Moreover, the description must at least describe the "proposed action and the action area (area including all direct and indirect effects)." *Id.*

In FWS's analysis for grizzly bears for the Project, the "description of the proposed action" is two sentences. Doc. 92-1 at 3. In its truncated description of the Project, FWS does not disclose how many acres of logging will occur, the type of forest that will be logged, the number of years that activity will occur, the miles of road that will be built for the Project, the miles of road that will be used for the Project, or any other detailed information that is necessary "for the reader to understand and evaluate the action." Section 7 Handbook 4-15; Doc. 92-1 at 3. In contrast, the "description of the proposed action" in the Rock Creek Mine site-specific biological opinion is multiple pages. Exhibit A at A-1 – A-7.

Furthermore, FWS does not disclose the action area for the grizzly bear analysis, which is a basic requirement in this section. ESA Section 7 Handbook 4-15. Finally, FWS does not disclose "any conservation measures proposed as part of

the action," such as the five year duration limit noted by the Court, which is another requirement for the description of the proposed action section.  ESA Section 7 Handbook at 4-19.

In the agency's description of the proposed action for the lynx analysis, which is also two sentences and lacks any meaningful details, FWS similarly fails to provide the requisite information discussed above.  Doc. 92-1 at 11.

**2.  Status of the species**

The "status of the species" section in a biological opinion must present "the biological or ecological information relevant to formulating the biological opinion," including "[a]ppropriate information on the species' life history, its habitat and distribution, and other data on factors necessary to its survival . . . ."  ESA Section 7 Handbook at 4-19.  More specifically, where the information is available, FWS should include the following:

- Species description – "current legal status of the species, including listing history, and current known range of the listed species found in the action area;"

- Life history – "longevity; age distribution; age to maturity; reproductive strategy (for example, the number of times mature individuals reproduce in a lifetime, or whether mature individuals reproduce sexually or asexually); recruitment; seasonal distribution patterns; biogeography; food habits; niche;

life cycle; hosts and symbionts; predators and competitors; and disease

factors;"

•      Population dynamics – population size, population variability, and population

stability;

•      Status and distribution – reasons for listing, rangewide trend, and new threats;

and

•      Analysis of the species likely to be affected –"summarizes the previous

discussion in Status of the species []and identifies those species or designated

critical habitat likely to be adversely affected. . . ;"

Section 7 Handbook at 4-20–4-22.  In sum, "[t]his analysis documents the effects of

all past human and natural activities or events that have led to the current status of

the species."  ESA Section 7 Handbook at 4-19.

In FWS's grizzly bear analysis here, it provides no information at all

regarding grizzly bear status to the reader in the "Status of the Species" section.

Doc. 92-1 at 3.  Instead, the agency only provides three sentences, which basically

list other documents that may or may not contain the required information on the

status of grizzly bears.  In contrast, in the Rock Creek Mine site-specific biological

opinion, FWS provides 16 pages of information on grizzly bear status, as required

by the Section 7 Handbook.  Exhibit 1 at A-7–A-23.

Likewise, in FWS's lynx analysis, FWS fails to provide any information on

lynx status to the reader in the "Status of the Species" section. Doc. 92-1 at 11.
Instead, the agency only provides three sentences, which basically list other
documents that may or may not contain the required information on the status of
lynx. Doc. 92-1 at 11.

    **3. Environmental Baseline**

    The "environmental baseline" section of a biological opinion must contain an
analysis of the effects of past and ongoing human and natural factors leading to the
current status of the species, its habitat [], and ecosystem, within the action area."
Section 7 Handbook 4-22. The environmental baseline section includes:

- Status of the species within the action area – "the percent or amount of the
  species range [] in the action area;" "whether the effect is quantitative,
  qualitative, or both;" "the distribution of the affected and unaffected habitat;"

- Factors affecting species environment within the action area – "State, tribal,
  local, and private actions already affecting the species or that will occur
  contemporaneously with the consultation in progress" and "[u]nrelated
  Federal actions affecting the same species [] that have completed formal or
  informal consultation" and "Federal and other actions within the action area
  that may benefit listed species. . . ."

Section 7 Handbook 4-22–4-23.

    The environmental baseline section of the Rock Creek Mine site-specific

biological opinion is 14 pages.  Exhibit A at A-23–A-37.  In contrast, the

environmental baseline section of the grizzly bear analysis for the Project is only

four paragraphs long and does not contain the required information.  Doc. 92-1 at 4.

Likewise, the "environmental baseline" section of the lynx analysis is only three

paragraphs and does not contain the required information.  Doc. 92-1 at 11. Both

lynx and grizzly bear "environmental baselines" fail to disclose the species status in

the action area in terms of the "the percent or amount of the species range [] in the

action area" or explain "the distribution of the affected and unaffected habitat" in

the action area.  Section 7 Handbook 4-22–4-23; Doc. 92-1 at 4.

Moreover, the grizzly bear "environmental baseline" analysis only discloses

existing road density in the action area; it does not address all other factors that may

affect the environment.  Doc 92-1 at 4.  Additionally, both the lynx and grizzly

"environmental baselines" fail to disclose all "State, tribal, local, and private actions

already affecting the species or that will occur contemporaneously with the

consultation in progress" and "[u]nrelated Federal actions affecting the same species

[] that have completed formal or informal consultation" and "Federal and other

actions within the action area that may benefit listed species. . . ."  Section 7

Handbook 4-22–4-23; Doc. 92-1 at 4.

### 4.  Effects of the Action

This section of a biological opinion "includes an analysis of the direct and

indirect effects of the proposed action on the species [] and its interrelated and interdependent activities." Section 7 Handbook at 4-23. The following factors must be considered regarding direct, indirect, interrelated, and interdependent effects/actions:

- Proximity of the action to the species;

- Distribution – "geographic areas where the disturbance occurs (e.g., may be several small or one large area)";

- Timing – "relationship to sensitive periods of a species' lifecycle";

- Nature of the effect – "effects of the action on elements of a species' lifecycle, population size or variability, or distribution";

- Duration – "Three potential categories of effects are: (1) a short-term event whose effects are relaxed almost immediately (pulse effect), (2) a sustained, long-term, or chronic event whose effects are not relaxed (press effect), or (3) a permanent event that sets a new threshold for some feature of a species' environment (threshold effect)";

- Disturbance frequency – "the mean number of events per unit of time";

- Disturbance intensity – "the effect of the disturbance on a population or species as a function of the population or species' state after the disturbance"; and

- Disturbance severity – "the effect of a disturbance on a population or species

as a function of recovery rate."

Section 7 Handbook 4-23 –4-26.

The effects analysis must also address the species' response to the proposed action, including the following factors:

- Numbers of individuals/populations in the action area affected – "number of individuals or amount of habitat affected, age, sex, breeding status, and distribution of affected individuals, as well as the genetic variability within the remaining population";

- Sensitivity to change – "degree to which a population or species is prone to change when disturbed";

- Resilience – "characteristics of populations, species [] allowing them to recover from different magnitudes of disturbance. For example, the greater the reproductive rate, the more resilient the species may be to population losses . . . .In a biological opinion, the biologist should determine the type and severity of the disturbance and determine how resilient the species or its habitat is to that particular type of disturbance";

- Recovery rate – "time required for an individual, population, species, community, or ecosystem to return to equilibrium after exposure to a disturbance."

Section 7 Handbook at 4-30–4-31.

In the effects analysis for its grizzly bear analysis here, FWS states that it already assessed existing road densities and availability of secure habitat in the action area in its 2006 Travel Plan Forest-wide programmatic biological opinion. Doc. 92-1 at 5. This representation is not accurate because the "action area" for the Travel Plan biological opinion is not the same as the action area for grizzly bears for the site-specific analysis for this Project. In the Project analysis, FWS discloses in the effects section that it chose to make the entire Henry's Lake #2 grizzly bear subunit its action area for this Project. Doc. 92-1 at 4.

In contrast, in the Travel Plan biological opinion, FWS only addressed road densities within the National Forest boundary, and did not assess road densities on private lands outside of the Forest: "Land outside of the Forest has no road density value." LW2-000522.[2] The 2003 Conservation Strategy discloses that private lands are part of the Henry's Lake #2 subunit: "a large percentage of the OMARD and TMARD values and secure habitat loss in these subunits [including Henry's Lake

_____

[2]The Henry's Lake #2 subunit road density analysis in the 2003 Conservation Strategy did include private, state, and county roads in addition to National Forest roads; that baseline was 46.1% OMARD, 28.1% TMARD, and 45.7% secure habitat. LW2-000723. If only private roads and state and county highways were considered, the numbers would be 14% OMARD, 7% TMARD, and 85% secure habitat. LW2-000724. In contrast, the Travel Plan biological opinion excluded all roads outside of the National Forest boundary in its analysis and provided the following road density estimates for Henry's Lake #2 subunit based on that exclusion: 36.5% OMARD, 29.0% TMARD, and 52.7% secure habitat. LW2-000524 (Table 6). FWS used the proposed densities in Table 6 as the surrogate amount of permitted take for the Forest. LW2-000540.

#2] is due to motorized access features on private land [].” LW2-000630-631.

Therefore, FWS’s attempt to tier to the Travel Plan biological opinion – and thereby

avoid a site-specific discussion of the effects of existing road density and secure

habitat in the action area – fails because the action area for the Travel Plan did not

address the full action area for this Project. *See Greenpeace v. Nat'l Marine

Fisheries Serv.*, 80 F. Supp. 2d 1137, 1150 (W.D. Wash. 2000)(“A biological

opinion which is not coextensive in scope with the identified agency action

necessarily fails to consider important aspects of the problem and is, therefore,

arbitrary and capricious.” )

Furthermore, FWS’s site-specific effects analysis on grizzly bears for the

Project consists of only five substantive paragraphs.   Doc. 92-1 at 5-6.  FWS states

that the six miles of temporary roads for this Project will have an insignificant

impact on grizzly bears because the Forest Service will barricade other roads before

Project implementation. *Id.*  The effects analysis also provides one paragraph on

food sources, one paragraph on forest structure, and one paragraph on food storage.

*Id.*  For each of theses areas, FWS provides no citation to any scientific references

or other reference documents, but nonetheless concludes the Project will have

insignificant, slightly beneficial, and discountable effects on grizzly bears in these

areas.

In presenting its conclusions on these four areas – temporary roads, food

sources, hiding cover, and food storage – FWS does not address the effects factors and species' response factors listed above, or provide support for its conclusions based upon grizzly bear life history, species status, or scientific research. *See* Section 7 Handbook 4-23–4-26, 4-30–4-31. As the District of Arizona has held: "Although the BiOp *concludes* that the proposed action 'will not affect [the species at issue]' . . . a full *analysis* of the effect of the proposed action . . . is absent.[] The court may not imply an analysis that is not shown in the record." *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp.2d 987, 999 (D. Ariz. 2011)(citations and internal punctuation omitted).

Likewise, the Ninth Circuit holds: "we cannot simply take the agency's word that the listed species will be protected. . . [i]f this were sufficient, the [agency] could simply assert that its decisions were protective and so withstand all scrutiny." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935 (9th Cir. 2008)(citation omitted)(affirming rejection of biological opinion). Thus, "while the [agency] can draw conclusions based on less than conclusive scientific evidence, it cannot base its conclusions on no evidence." *Pac. Coast Fed'n of Fishermen's Ass'ns v. United States Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005)(citation omitted)(rejecting biological opinion that made conclusions without supporting analysis); *see also South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F.Supp.2d 1247, 1267 (E.D. Cal. 2010). In contrast to the

cursory two page effects analysis for this Project, the effects analysis in the Rock Creek Mine site-specific biological opinion is 61 pages. *See* Exhibit A at A-37–A-98.

The agency's four-paragraph effects analysis for lynx fares no better due to its similar conclusory nature. Doc. 92-1 at 12-13. FWS states that logging lynx foraging habitat will likely adversely affect lynx. Doc. 92-1 at 12. FWS then states "other effects to lynx have been considered," but the agency fails to discuss or disclose any of those "other effects" of the Project. *Id.* This Court's Order was clear that FWS must address all effects in its site-specific biological opinion, not just adverse effects. *Krueger*, 63 F.Supp.3d at 1252-1253. FWS has failed to comply with the Court's Order.

### 5. Cumulative effects

"Cumulative effects include effects of future State, tribal, local, and private actions, not involving a Federal action, that are reasonably certain to occur within the action area under consideration." Section 7 Handbook 4-31. "Gathering information on cumulative effects often requires more effort than merely gathering information on a proposed action.. . .Information on future non-Federal actions can be obtained through observations and inquiries during field reconnaissance in the action area; discussions with State game and fish agencies and other Federal, State, tribal and local agencies, and conservation organizations; and newspapers and other

sources of local information (e.g., radio, television, libraries)." Section 7 Handbook 4-32.

The cumulative effects section of the grizzly bear analysis is one substantive paragraph. Doc. 92-1 at 6. The cumulative effects section of the lynx analysis is also one substantive paragraph. Doc. 92-1 at 13. In both paragraphs, FWS mentions livestock grazing and fuel reduction treatments around private homes and businesses as foreseeable future actions in the action area, but the agency does not address the effects of these actions, and does not disclose the details the agency knows regarding these activities. For example, FWS fails to disclose how many acres in the action area are affected by private livestock grazing, the location of this livestock grazing, or any of the scientific research on how livestock grazing may affect grizzly bears.

Likewise, FWS provides no analysis on how logging on both private and federal lands might cumulatively impact grizzly bears and lynx in terms of displacement. Notably, FWS is aware that the Henry's Lake #2 subunit provides "the least amount of security core of the 14 subunits occurring on the Forest." LW2-000524 (Travel Plan Biop). Yet there is no disclosure of that fact in this Project analysis, and there is no discussion of how the lack of security habitat in conjunction with concurrent logging operations on both private lands and federal lands might cumulatively impact the amount of secure habitat available for grizzly

bears or lynx that are displaced by logging operations.

In a similar case, the Western District of Washington held: "Although BiOp2 states that its conclusions are based on a "cumulative effects analysis," [] and even contains a section titled "Cumulative Effects," [] in fact this section contains no analysis whatsoever and is nothing more than a list of [actions]." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F.Supp.2d 1137, 1149 (W.D. Wash. 2000). Likewise, in this case, FWS's list of few activities does not constitute a cumulative effects analysis.

Finally, in the Project EIS, the Forest Service discloses:

> Private land exists within the Forest Service administrative boundary in several locations within the analysis area. There is cattle grazing on private land south of the South Fork of the Madison; horses grazing on private land adjacent to Watkins Creek allotment near the project area; weed spraying/spreading and *construction of homes/structures, roads,* parking lots, and activities associated with summer home occupancy and a guest ranch.

LW2-00188 (emphasis added). In its analysis, FWS does not disclose the cumulative effects of the Project and additional private home construction, additional private road construction, and other additional activities associated with summer home and ranch occupancy in the action area.

### III.  CONCLUSION

As set forth above, FWS has failed to comply with both the general and express requirements from this Court's summary judgment Order. In general, FWS

has failed to prepare site-specific biological opinions for lynx and grizzly bears that comport with the routine required analysis elements as set forth in the agency's own Section 7 Handbook, and as demonstrated by the site-specific biological opinion for the Rock Creek Mine. FWS has failed to explain its sudden departure from its established practices for biological opinions, or otherwise explained why the elements addressed above are no longer necessary in biological opinions. *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, --- F.3d ----, 2015 WL 4547088 at *10 (9th Cir. 2015) (*en banc*) (unexplained agency change in position is arbitrary and capricious).

Moreover, FWS has also (a) failed to address all effects and cumulative effects to grizzly bears from logging activities associated with the Project, (b) failed to analyze the validity of the assumptions of the 2007 Lynx Amendment Biological Opinion, and (c) failed to address all effects and cumulative effects to lynx from the Project. For these reasons and all other reasons set forth by Plaintiffs in prior briefing, Plaintiffs respectfully request that the Court deny the agencies' motion. Respectfully submitted this 31st Day of July, 2015.

> */s/ Rebecca K. Smith*
> Rebecca K. Smith
> PUBLIC INTEREST DEFENSE CENTER, PC
>
> Timothy M. Bechtold
> BECHTOLD LAW FIRM, PLLC
> Attorneys for Plaintiffs

CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is 4,543 words, excluding the caption, table of contents, table of authorities, index of exhibits, signature blocks, and certificate of compliance.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, P.C.

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiffs